721 F.2d 713
 David BULLOCH, McRae Bulloch, Kern Bulloch, Douglas Cory,
A.C. Seegmiller, Myron Higbee, Nelson Webster, Lillian W.
Clark, for herself and as personal representative of the
estate of Douglas C. Clark, deceased, Lambeth Brothers
Livestock, a partnership, T. Randall Adams, Dee Evans and
John Does I through XX, Plaintiffs-Appellees,
v.
UNITED STATES of America, Defendant-Appellant.
 Nos. 82-2245, 82-2352.
 United States Court of Appeals,
Tenth Circuit.
 Nov. 23, 1983.
 
 Marc Johnston, Atty., Dept. of Justice, Civ. Div., Washington, D.C. (J. Paul McGrath, Asst. Atty. Gen., Dept. of Justice, Washington, D.C., Brent D. Ward, U.S. Atty., Salt Lake City, Utah, Robert S. Greenspan, Atty., Dept. of Justice, Civ. Div., Washington, D.C., with him on the brief), for defendant-appellant.
 Dan S. Bushnell of Kirton, McConkie & Bushnell, Salt Lake City, Utah (Bruce Findlay and M. Karlynn Hinman, Salt Lake City, Utah, with him on the brief), for plaintiffs-appellees.
 Before SETH, Chief Judge, McWILLIAMS, Circuit Judge, and KERR, District Judge*.
 SETH, Chief Judge.
 
 
 1
 This is an appeal from a judgment by the trial court which granted relief to the plaintiffs in an independent action to set aside, on the ground of fraud, a judgment against them entered by the same court in 1956. Relief was also sought under Rule 60(b). The original action was a Tort Claims Act suit for the loss of sheep asserted to have been caused by radiation from atomic tests at the Las Vegas Test Site in 1953.
 
 
 2
 In the original case the findings and conclusions were that the sheep had not died as a consequence of the atomic tests but had died from other causes.
 
 
 3
 The original Tort Claims Act suit is referred to by the parties as Bulloch I. A very small portion of the testimony was transcribed and the notes have been lost. Only a few of the exhibits are available. There are some depositions and briefs which have survived. The trial judge in his oral and written findings and conclusions summarized the testimony. The opinion appears at 145 F.Supp. 824.
 
 
 4
 The plaintiffs in the appeal before us assert that there was information withheld from them in the original suit, that witnesses for the Government were pressured, and there was fraud on the court. The plaintiffs also filed a motion to set aside the original judgment. The trial court entered judgment in the separate action and ordered that the judgment of 1956 be set aside by reason of fraud on the court. The court also awarded attorney fees to the plaintiffs. The Government has taken this appeal.
 
 
 5
 The record in Bulloch I which has survived is very limited. As mentioned, a very small part of the testimony as transcribed is available. From the depositions, briefs and memoranda and with the trial court's summary, the trial as to the specific points relied on by the trial court in Bulloch II can be reconstructed with some confidence. Most of the witnesses from Bulloch I testified again.
 
 
 6
 The trial court in its conclusions and findings in Bulloch II, 95 F.R.D. 123, makes several general statements as to fraud and withholding of information in Bulloch I. The trial court makes reference to four specific events at trial of Bulloch I or items of proof. Presumably the general observations or statements as to fraud are drawn from these particulars.
 
 
 7
 The four particular items mentioned by the trial court are:
 
 
 8
 (1) The Bustad Report--a comparison of radiation tests on sheep at Hanford with the data on the Utah sheep. The Hanford experiments had been made several years before the Utah suit. The trial court concluded that the comparison omitted essential facts.
 
 
 9
 (2) That the Government had given misleading information as to measures of radiation at certain places--radiation dosages.
 
 
 10
 (3) That witnesses, especially the veterinarians, had been "pressured" to testify in a certain way.
 
 
 11
 (4) That the Government had given misleading answers to interrogatories.
 
 
 12
 Estimates of radiation dosages were, of course, a significant part of the Bulloch I trial. The amount of radiation to which plaintiffs' sheep had been exposed was a factual issue at the first trial. Plaintiffs' Trial Memorandum in Bulloch I details the radiation dosages which were the subject of their claim, and an exhibit was presented by plaintiffs to demonstrate the point. The plaintiffs had available and used the same basic data used by the Government to make its estimates. The plaintiffs also presented at the original trial additional radiation maps apparently derived from their own sources. The record thus shows that all the information the Government had as to dosages was available to plaintiffs, and that they also had other data.
 
 
 13
 The data and maps presented the material in a detailed manner. It is apparent that during the investigation by the Government preceding the trial the dosages were revised as it progressed. These revisions were always upward and were, according to the testimony, to give maximum levels and thus to be above "probable average values." The plaintiffs were aware of these revisions and the reasons long before the trial. Since all data was available the parties could trace its development during the investigations. There was also available the reports, with the opinions of the experts, which will be mentioned later but which show a change of opinion as the investigations progressed and as experiments were conducted. All of this was before Bulloch I, and revealed in detail to plaintiffs. There was no evidence presented at Bulloch II that the maps or data were incorrect.
 
 
 14
 The plaintiffs assert that the Government knew at the time of the first trial that there were unexplained small areas of higher radiation within generally lower areas. These were referred to in the second trial as "hot spots." The plaintiffs assert that this phenomenon was not revealed at the first trial, and it was not. The plaintiffs state that this condition was discovered with the detonation of the Boltzman shot, and the record so reflects, but this event was not until 1957, and hence after the first trial, so nothing was withheld as to this condition at Bulloch I as no one knew of its existence.
 
 
 15
 All the witnesses who testified in Bulloch I who were supposed to have participated in the suppression of evidence testified in Bulloch II. They also there testified specifically that there had been no suppression whatever of evidence at Bulloch I. They likewise testified that there had been no attempt to pressure them as to their opinions or as to their testimony.
 
 
 16
 It may be repetitious, but the most significant aspect of the records in Bulloch I and II is that all the information, data and witnesses were available to plaintiffs at Bulloch I. The plaintiffs chose to use some of the data and not other parts; they likewise selected among the witnesses who were made available for depositions and for trial; also they limited the extent of their consideration of the reports and studies which were provided to them. Plaintiffs in Bulloch I thus tried the case the way they wanted. They made decisions on what to put on as trial strategy and limited their review of data reported. It appears that they would not try the case the same way should they have another chance although the material is the same.
 
 
 17
 As mentioned, the record shows that at Bulloch I the Government provided all data plaintiffs asked for. They were given the AEC file data on the investigation of the sheep deaths. The Government made an offer to make available the individuals who had participated in the study, and any others. Other reports of experiments were provided and the experts were available for depositions. The Government did have all the technical data in 1953 and 1954, and conducted the experiments and investigations, but again this was made available to plaintiffs. This is all the data that is now available.
 
 
 18
 The plaintiffs had knowledge of the series of reports made by the Government veterinarians during the course of the investigations. They were aware that the conclusions of each were not the same, and were aware that positions changed as the pretrial investigation progressed. We find nothing whatever that could have misled plaintiffs as they could trace the progress of the investigation from the reports which were provided to them. Again, they had the data the Government had. If they did not choose to use it that was a decision they made. The reports of the investigation were quoted at length in plaintiffs' Bulloch I trial memorandum, and the depositions show they had the documents and the information. Dr. Holmes, one of the persons participating in the investigation, was called as a witness by plaintiffs, and they had several pre-Bulloch I trial conversations with him. Dr. Holmes had died before Bulloch II. The plaintiffs assert that the Government presented an untrue representation as to the views of Dr. Holmes at Bulloch I, but again, he testified for plaintiffs and they had a full opportunity to interview him. The plaintiffs assert that the correct version of his views was revealed by certain documents they now refer to; however, these documents were available to them at the first trial.
 
 
 19
 The record shows that the trial court in Bulloch I considered the views of the veterinarians Veenstra, Holmes and Thompsett, and their development during the investigation. There appears to be nothing unusual about this.
 
 
 20
 The AEC facilities at Hanford, Washington had done some experiments from 1949 to 1953 (before Bulloch I ) to study radiation damage to sheep and lambs. The sheep were fed radioactive material in this experiment. The Government asked the officials at Hanford to compare the data they had obtained with the data on the Utah sheep. The comparison was made, and the report was known at Bulloch I as the Bustad Comparative Study. This report concluded that the "Utah sheep showed no evidence of the radiation damage observed in experimentally treated sheep."
 
 
 21
 The experts testified that if the Hanford ewes ingested radioactive material they would develop a hypothyroid condition, and the lambs would be weak and die not long after birth. The Utah ewes however had not developed any abnormalities of the thyroid, and thus the experts found no significant similarity between the two groups and concluded the Utah sheep and lambs had not died from radioactive exposure. The trial court did not follow the testimony of the experts in the second trial and relied only on the fact that the lambs were weak and died young in both groups to establish a similarity. The trial court thus concluded that the Bustad report did not reveal all it should have by not comparing the early death of lambs as the important factor and thus something was withheld. The experts relied on the thyroid comparison as the significant factor.
 
 
 22
 All the Hanford data was published and was available to the public in 1953. This comparison listed the previous reports and it referred the readers to the listed reports for the "details of the experiments." The Report recited that it only purported to be a summary of the experiments and conclusions. The basic data was cited. The plaintiffs thus had available all the pertinent data on the experiments with clear references-citations to the details. The damages caused by radiation at the Hanford experiments were there clearly identifiable, as mentioned, but there was no such damage in the Utah sheep.
 
 
 23
 We find nothing to demonstrate that misleading answers were made by the Government in Bulloch I. The plaintiffs were familiar with all the background data as hereinabove described. With this familiarity they chose not to seek additional answers or clarifications.
 
 
 24
 The Comparative Study referred to above became a central issue in Bulloch II in the trial court's finding of failure to disclose by the Government, but there is no basis in the record to suggest that anything was withheld.
 
 
 25
 The several specific items referred to by the trial court in its findings in the case before us have been considered in the foregoing description. As mentioned at the outset, these are the only particular matters referred to and the balance of the trial court's findings and conclusions are in general terms, and could only be based on these factors.
 
 
 26
 The trial court thus (1) mentioned the Bustad report and asserted that information had been withheld; (2) it mentioned that the Government had given misleading information as to radiation dosages; (3) that the veterinarians had been pressured by the Government; and (4) that misleading answers had been given to interrogatories by the Government. Each of these specifics have been considered in relation to the record in the proceedings appealed from and to what original record and briefs are extant. We must conclude that none of these several findings or conclusions are supported by the record. The information, data, reports, maps, experiments and witnesses were all available to plaintiffs at the first trial. The data is the same now. They tried their case on the basis of their then best judgment in the selection of witnesses, interviews, the evaluation of data and reports, and the consideration of the position of the experts.
 
 
 27
 The trial court in its Memorandum shows that it would draw different conclusions and inferences from the testimony, and from the developing opinions of the veterinarians.
 
 
 28
 We have not mentioned the Los Alamos Scientific Laboratory comparative study of radiation burns (in experiments) and the lesions on the Utah sheep. The analysis of tissues, organs, bones and blood samples made by Doctors Comar, Rust and Trum showed no evidence of radiation injury to the sheep in the flocks of plaintiffs where the losses took place. A tissue analysis was made on the sheep by the Utah University College of Medicine and the conclusion was reached that the sheep had been exposed to radiation but the examination concluded that there had been no acute effects from the exposure. The Hanford comparative study, as mentioned, concluded that the sheep had not died from exposure to radiation.
 
 
 29
 In Bulloch I the conclusion of the experts was that the sheep and lambs had died as a result of unprecedented cold weather during the lambing and shearing, together with malnutrition, also to generally poor range conditions and to common diseases which caused the skin lesions and deaths. These conditions were established by the evidence. The losses began after an initial detonation but before the detonation of the "Harry" test. The expert witnesses who were the leading authorities on the subject thus concluded that the losses were not due to radiation. There was no evidence presented that humans in the areas with the sheep nor animals such as the sheep dogs or horses, which were with the sheep, were affected.
 
 
 30
 It is apparent that in Bulloch II the assertions of fraud against the Government, the witnesses, the Government employees, the experts and the attorneys for the Government were all fully tried and considered. As stated above, there was no evidence whatever of fraud developed in the court hearings which covered all the details. The plaintiffs in Bulloch II again put on the evidence on this issue and were unable to make a case against anyone concerned. The non-party individuals were there considered by name. The hearings were conducted on the new complaint of plaintiffs and the trial court directed its decision to the complaint rather than to the separate motion to reopen the old case.
 
 
 31
 It appears that a Congressional hearing relating to the test firings was held several years before the plaintiffs filed this second suit. Some of the plaintiffs appeared at the hearings and made statements and their attorney filed a "report". Only the complainants' side of the dispute was so presented. The trial court makes reference to these 1979 hearings and apparently gave them some weight in its findings. The plaintiffs put great emphasis on the Congressional hearings and all or much of the report of the hearings was made a part of the record. We must instead rely entirely on the record made during the proceedings in Bulloch I and II within the Rules of Federal Procedure.
 
 
 32
 The public discussions of atomic energy and weapons have heated up to a great degree since Bulloch I 25 years ago. There is now a much greater public awareness of issues relating to atomic bombs and radiation. This is certainly as it should be.
 
 
 33
 This recent increase in the heat, the light, and awareness of atomic energy is all worthwhile, but we are unable to find in it any reason, as the plaintiffs apparently would have us do, to overturn the considered judgment of the court reached 25 years ago.
 
 
 34
 The plaintiffs also have a heavy burden to demonstrate why they waited these many years to make the assertions they have made in this action. The only event of any consequence which has taken place and which seems to be relied on by plaintiffs were the 1979 Congressional hearings referred to above. The trial court also seems to have given this event some weight, as mentioned. This cannot be enough alone nor with the other assertions. The hearings purported to consider only one side of the incidents and only the plaintiffs and their attorney sought to use it to present their claims and personal views. If this was the source of the data upon which this proceeding is sought to be based, it must fail.
 
 
 35
 The judgment in Bulloch I was entered in the fall of 1956, as mentioned, and by the same court from which this appeal is taken and by the same judge. The parties are the same as well. This action to set aside the judgment was filed in February of 1981. As mentioned, it is basically a separate or independent action to set aside the judgment on equitable grounds, although it does mention Rule 60(b). Before judgment was entered in 1956 the plaintiffs were asserting that there had been some sort of "cover-up". However, they acknowledged that they did nothing about it for 20 or 25 years. Plaintiffs have produced nothing to explain why they waited for 25 years to file this action and of more importance they have come forward with nothing of any consequence which was not available to them at Bulloch I. This has been referred to above in the consideration of the specific points mentioned by the court. But to repeat, everything was then available to plaintiffs and they made their choice as to what to do and what to use. The trial court in its memorandum opinion in Bulloch II describes much of the material, reexamines it and draws conclusions.
 
 
 36
 During the 25-year period witnesses Thomsett and Holmes have died, and there is no physical evidence available. The principal witness for plaintiffs in Bulloch II, Mr. Knapp, acknowledged that nothing would be accomplished by any additional study of the circumstances. Thus it must be concluded that the plaintiffs would have the court reexamine the same material that was available in 1956. As mentioned, the public attitude toward atomic testing and atomic energy has changed very much since 1956 as has public awareness. The Congressional hearings in 1979 demonstrated this quite clearly, and the plaintiffs would use them as a reason to retry their case.
 
 
 37
 This case demonstrates the very good reasons why judgments should be final and should not be disturbed. The plaintiffs to prevail must have shown by clear and convincing evidence that there was fraud on the court, and all doubts must be resolved in favor of the finality of the judgment.
 
 
 38
 It is beyond question that a federal court may investigate a question as to whether there was fraud in the procurement of a judgment. Universal Oil Products Co. v. Root Refining Co., 328 U.S. 575, 66 S.Ct. 1176, 90 L.Ed. 1447. This is to be done in adversary proceedings as in the case before us. See Hazel-Atlas Glass Co. v. Hartford-Empire Co., 322 U.S. 238, 64 S.Ct. 997, 88 L.Ed. 1250; Sprague v. Ticonic National Bank, 307 U.S. 161, 59 S.Ct. 777, 83 L.Ed. 1184; and United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93.
 
 
 39
 Fraud on the court (other than fraud as to jurisdiction) is fraud which is directed to the judicial machinery itself and is not fraud between the parties or fraudulent documents, false statements or perjury. It has been held that allegations of nondisclosure in pretrial discovery will not support an action for fraud on the court. H.K. Porter Co., Inc. v. Goodyear Tire & Rubber Co., 536 F.2d 1115 (6th Cir.). It is thus fraud where the court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function--thus where the impartial functions of the court have been directly corrupted.
 
 
 40
 The basic decisions of the Supreme Court are Throckmorton, Hazel-Atlas, and Universal Oil Products, cited above. These cases considered the basic issues raised in cases to set aside judgments and demonstrate with Marshall v. Holmes, 141 U.S. 589, 12 S.Ct. 62, 35 L.Ed. 870, the nature of the fraud and the proof required for relief as set out in the preceding paragraph.
 
 
 41
 As to actions for relief from fraud on the court it is generally held that the doctrine of laches as such does not apply, but unexplained delays bear on the basic concept of the finality of judgments and the proof. Rule 60(b) does not impose a time limit on motions asserting fraud on the court. The rule also, of course, recites that it does not limit the power of the courts to consider independent actions to relieve a party from a judgment.
 
 
 42
 In Wilkin v. Sunbeam Corp., 466 F.2d 714 (10th Cir.), we considered a claim under Rule 60(b). It was there said that: "Relief under the rule may be granted when the application is clearly substantiated by adequate proof." There also it appeared that the documents complained of were in whole or in part available at trial but no use was made of them. In Chisholm v. House, 160 F.2d 632 (10th Cir.), we considered equitable relief from a judgment for fraud, and considered the intrinsic and extrinsic distinction, citing United States v. Throckmorton, 98 U.S. 61, 25 L.Ed. 93.
 
 
 43
 The plaintiffs in their independent action asserted fraud on the court in the withholding of data, records and letters. They have set forth extravagant statements in their briefs which have not been borne out by the record. The showing made by plaintiffs in the Bulloch II hearings falls far short of proof of fraud on the court or any other kind of fraud.
 
 
 44
 As mentioned, the trial court concluded in Bulloch II that there had been a fraud on the court (the same judge) in Bulloch I. In so doing, the court seems to have placed much, if not controlling, weight on the hereinabove described development (prior to Bulloch I ) of the opinions of the veterinarians during the course of the investigations. We have considered this carefully (with the other factors raised by the trial court) and must conclude that nothing was demonstrated which would constitute fraud on the court.
 
 
 45
 We must thus conclude that the trial court was so in error and its conclusion and judgment constituted an abuse of discretion. The award of attorney fees must also be set aside.
 
 
 46
 The judgment of the trial court is set aside. The case is REVERSED and REMANDED.
 
 
 
 *
 Honorable Ewing T. Kerr, United States Senior District Judge for the District of Wyoming, sitting by designation