**In re TRI–CRAN, INC., Debtor.**

**TRI–CRAN, INC., Plaintiff,**

v.

**John FALLON, Defendant.**

**Bankruptcy No. 85–1253–CJK.**
**Adv. No. 88–1241.**

United States Bankruptcy Court,
D. Massachusetts.

March 17, 1989.

Harold Potter, Boston, Mass., Trustee.

Charles Bennett, Boston, Mass., for defendant.

Neil Satran, Nina Parker, Boston, Mass., for debtor.

Paula Bonnell, for U.S. trustee.

## MEMORANDUM OF DECISION

CAROL J. KENNER, Bankruptcy Judge.

The Trustee in Bankruptcy brought this adversary proceeding to vacate a sale in bankruptcy of the Debtor's assets to the Defendant for collusion and fraud on the court. The matter has been tried, and the parties have filed suggested findings of fact and conclusions of law. This memorandum contains my findings of fact and conclusions of law on the merits of the controversy, and on certain procedural defenses the Defendant raises. I find that the Defendant committed fraud on the court and rule that the sale should be vacated.

*Procedural History of the Adversary Proceeding*

On March 21, 1988, Harold W. Potter, Jr., the Debtor's Trustee in Bankruptcy, filed a Motion to Set Aside Sale. The motion sought to set aside the sale by the Debtor in Possession of its assets to John Fallon, a sale that was approved by the Court over the objections of the United States Trustee and of the Debtor's minority stockholders, Clarence A. Serpa, Jr. and Paul A. Florindo. The Trustee alleged as the basis for setting aside the sale that statements to the Court at the hearings on the objections to the sale were inaccurate and misleading, that the statements were known to be relevant to the approval of the sale, and that Fallon was not a purchaser in "good faith" and "for value."

Fallon filed a response in which he argued that the motion should be denied because it was filed late and because it failed to state a claim on which relief could be granted. Neither of these arguments has yet been disposed of. In the alternative, Fallon argued that the motion failed to set forth sufficient factual allegations to put John Fallon (or any other party) on notice of the issues in dispute. I agreed with Fallon on the latter point and ordered the Trustee to set forth his allegations more fully in an adversary complaint.

The Trustee then filed the detailed complaint that initiated this adversary proceeding. In essence, the complaint alleges that Fallon colluded with Richard Gargiulo, a

stockholder of the Debtor, with Edward Gargiulo, Fallon's friend and Richard's brother and law partner, and with Neal Satran, counsel for the Debtor in Possession, to obtain Court approval of the sale at the lowest possible price and, in furtherance of this scheme, conspired to and did conceal from and misrepresent to the Court, despite direct inquiry, the personal relationship between Fallon and the Gargiulos and the less than arm's length dealings between Fallon and the Debtor.

John Fallon, the only defendant named in the complaint, filed an answer denying the existence of any collusion and asserting that he purchased the Debtor's assets in good faith, at fair market value, and in an arm's length transaction. Fallon also listed several specific defenses: the complaint fails to state a claim on which relief can be granted; the complaint is barred by the applicable statute of limitations; the complaint fails to plead fraud with sufficient particularity to satisfy Rule 9 of the Federal Rules of Civil Procedure, made applicable hereto by Bankruptcy Rule 7009; and the complaint fails to join necessary parties who are subject to process.[1] The case was tried, and the parties have submitted proposed findings of fact and conclusions of law.[2]

### History of the Case

Before addressing the merits, it would help to explain the history of the bankruptcy case from which this adversary proceeding arises. The Debtor, a cranberry farming corporation, filed its petition under Chapter 11 of the Bankruptcy Code on November 6, 1985. On July 22, 1986, the Debtor filed a Notice of Intended Private Sale in which it gave notice of its intent to sell virtually all its assets to John Fallon, the Defendant herein, for $480,000.00. The assets being sold consisted principally of 383 acres of real estate (the "property") situated in the Towns of Rochester and Marion, Massachusetts.[3] No counteroffers were timely filed, but four parties filed objections to the proposed sale: (1) the United States of America on behalf of the Farmers Home Administration (FmHA), one of the two mortgage holders on the property; (2) Antone J. Florindo and others, who jointly held the other mortgage; (3) Paul A. Florindo and Clarence A. Serpa, Jr., two of the Debtor's four stockholders;[4] and (4) the United States Trustee. The mortgagees' objections were ultimately withdrawn and have no bearing on the present proceeding.

The minority stockholders' objection rested on two bases: the property had been appraised for an amount considerably higher than the proposed sale price, and, most significantly, the Debtor had not disclosed the identity of the buyer, John Fallon, or his relationship to the other parties to this bankruptcy. (The objection did not state

---

1. Fallon pleaded additional defenses: that the complaint is barred by laches because the Trustee delayed unreasonably in filing it and thereby prejudiced Fallon; and that the Trustee, "by reason of his acts and conduct," has waived any rights against Fallon and is estopped from asserting any claims against them. These defenses were not supported by specific evidentiary allegations; nor were they developed or argued in Fallon's closing arguments or his Suggested Findings of Fact and Rulings of Law. Moreover, I find no evidence to support these defenses. I therefore overrule them. I also find that the complaint pleads fraud with sufficient particularity; therefore, I reject without further comment Fallon's Rule 9 defense.

2. After this complaint was tried and taken under advisement, the Court received an affidavit from Attorney Nina Parker, a letter from Attorney Neal Satran, and another letter from Attorney William F. Looney, Jr., on behalf of Parker

and Satran, both of whom served as Debtor's counsel during the proceedings under scrutiny. The form, content and timing of these letters leave me with little alternative but to regard them as improper attempts to circumvent evidentiary procedures and to influence the Court's findings and conclusions. The affidavits and letters are neither evidence nor pleadings and have been given no consideration.

3. The other assets included most of the Debtor's machinery and equipment, all inventory and crop rights, the right to use the name "Tri–Cran," and all other real and personal property located on the property and not included within the above categories. The purchaser was also to assume the two mortgages on the property.

4. The other stockholders, who together held a majority of the outstanding shares, were Robert Murphy and Richard Gargiulo.

what relationship Fallon had to the Debtor or any of its affiliates, nor did it state why any relationship would constitute a ground for denying the sale.) I overruled the stockholders' objection, in part because neither they nor counsel for them appeared at the September 10, 1986, hearing on the objections. The stockholders filed a motion for reconsideration alleging that a prospective purchaser named David Grant was prepared to offer $500,000.00 for the assets being sold. I denied the motion for reconsideration because it did not explain the stockholders' failure to appear at the hearing on their objection and because Mr. Grant's counteroffer was late.

The United States Trustee's objection was initially overruled, but its motion for reconsideration was allowed. The United States Trustee stated several grounds for its objection, the most significant of which, for present purposes, were that the sale price was seriously inadequate and that the Debtor had not publicly advertised the sale of the property. I held a hearing on the objection on October 2, 1986, after which I overruled the objection and allowed the sale to go forward in an Order and Memorandum dated October 8, 1986.

The United States Trustee and stockholders Serpa and Florindo appealed to the United States District Court from my order overruling their objections and approving the sale, but neither the stockholders nor the United States Trustee obtained a stay of the order pending appeal. Consequently, the property and other assets described in the Notice of Intended Sale were sold to John Fallon.

While the appeal was pending, I ordered that a Chapter 11 Trustee be appointed; Harold J. Potter, Jr., the Plaintiff herein, was appointed Trustee, and I approved his appointment. Then on August 17, 1987, this case was converted to a case under Chapter 7 of the Bankruptcy Code, and Mr. Potter was appointed Trustee under that chapter.

On December 17, 1987, the Trustee filed a report (the "Trustee's Report") in this Court. The report set forth the results of an investigation he had undertaken into allegations by stockholders Serpa and Florindo that the Debtor's other stockholders, Richard Gargiulo and Robert H. Murphy, had engineered the sale to Fallon at a bargain price and had a side deal with Fallon such that Gargiulo and Murphy were secret partners with Fallon in the purchase and would retain control of the property. On the basis of his findings, the Trustee asked the District Court to stay its decision on the appeal from my order approving the sale and to remand the matter to the Bankruptcy Court. On January 7, 1988, the District Court (Zobel, J.) issued the following order:

> Because the Trustee's Report on the basis of newly-discovered evidence raises substantial questions about the good faith of the purchaser and the sale, this matter is remanded to the Bankruptcy Court for further consideration of the Notice of Intended Private Sale and the Objections thereto.

The Trustee then filed in this Court the motion to set aside sale that gave rise to this adversary proceeding.

*Defenses*

### 1. Motion Filed Untimely

The first defense Fallon raises is that Rule 60(b) of the Federal Rules of Civil Procedure, made applicable to this proceeding by Bankruptcy Rule 9024, requires that motions for relief from an order, when based on newly discovered evidence or on fraud, misrepresentation or misconduct, shall be made not more than one year after the order was entered. The Trustee's complaint to set aside sale was filed more than one year after entry of the order approving the sale; therefore, Fallon concludes, the Trustee's complaint was filed late and must be dismissed.

■ Rule 60(b), the relevant portion of which is set forth in the margin,[5] sets a

---

5. Rule 60(b) reads as follows:
   On motion and upon such terms as are just, the court may relieve a party or a party's legal

representative from a final judgment, order, or proceeding for the following reasons: ...
(2) newly discovered evidence which by due

time limit for the filing of various motions for relief from order or judgment. Where the motion is based on newly discovered evidence or on fraud or misrepresentation, the motion must be filed within one year of entry of the order or judgment from which it seeks relief; however, the rule's time limitation does not apply when the basis of the motion is fraud upon the court.

It is undisputed that the complaint was filed more than one year after entry of the order approving the sale.[6] And the filing of an appeal from that order does not toll the running of the period within which the motion for relief must be filed. *United States ex rel. Bonner v. Warden*, 78 F.R. D. 344 (N.D.Ill.1978). Therefore, if the Trustee's complaint seeks to set aside the sale solely on the basis of Rule 60(b)(2) (newly discovered evidence) or Rule 60(b)(3) (fraud, misrepresentation, or misconduct), the complaint must be dismissed as untimely.

■ The viability of the Trustee's complaint thus depends on whether it states a cause of action for "fraud upon the court," as that term is used in Fed.R.Civ.P. 60(b). I discuss the nature of fraud on the court elsewhere in this memorandum and need not repeat that discussion here. In short, fraud on the court is fraud committed by the court, by an officer of the court, or by one who colludes with the court or an officer of the court; its result is a judgment obtained through the corruption of judicial officers, which corruption prevents the judicial machinery from performing its usual functions in an impartial manner. The complaint alleges that Fallon colluded with two officers of the court—counsel for and a principal of the Debtor in Possession—to obtain the Debtor's property for Fallon for the lowest possible price. It also alleges that Fallon colluded with the same officers of the court to conceal from and misrepresent to the Court the personal relationship between Fallon and the Gargiulos and the less than arm's length dealings between Fallon and the Debtor. The complaint thus clearly states a cause of action against Fallon for fraud on the court. It alleges that Fallon helped officers of the Court to breach their fiduciary obligation to get the best deal possible for the bankruptcy estate; that he helped them to breach their fiduciary obligation to deal honestly with the Court; and that he profited from his collusion at the expense of the estate and of the Court.

■ Rule 60(b) expressly "does not limit the power of a court to entertain an independent action ... to set aside a judgment for fraud upon the court." F.R.Civ.P. 60(b). Therefore, the one year limitation that Rule 60(b) places on motions based on the grounds listed in subsections (1), (2), or (3) thereof does not apply to this proceeding. Rather, because fraud on the court diminishes the integrity of the judicial machinery itself, "[t]he public welfare demands that the agencies of public justice be not so impotent that they must always be mute and helpless victims of deception and fraud." *Hazel–Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. 238, 246, 64 S.Ct. 997, 1001, 88 L.Ed. 1250. To vindicate the integrity of the judicial process, a court may entertain a complaint for fraud on the court long after the judgment itself was entered. *Id.* In *Hazel–Atlas*, for example, the Supreme Court upheld the pow-

---

diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; ... or (6) any other reason justifying relief from the operation of the judgment. The motion shall be made within a reasonable time, and for reasons (1), (2), and (3) not more than one year after the judgment, order, or proceeding was entered or taken.... This rule does not limit the power of a court to entertain an independent action ... to set aside a judgment for fraud upon the court.

6. I entered the order approving the sale on October 8, 1986. The Trustee did not file his motion to set aside sale until March 21, 1988. The earliest action taken by the Trustee with respect to the sale was his filing with the District Court a motion to stay decision and to intervene. That motion was filed on November 4, 1987. Therefore, even if the Trustee's motion to set aside sale related back to the date of the District Court motion, it was still filed more than one year after entry of the order approving sale.

er of a lower court to entertain an action for fraud on the court that was commenced over eight years after the original judgment was entered. *Id.* at 239, 244–246. *See also Root Refining Co. v. Universal Oil Products Co.*, 169 F.2d 514, 521–522 (3rd Cir.1948) (a judgment's freedom from fraud is a matter of "vast public importance" that "may always be the subject of further judicial inquiry"; "it becomes immaterial that the injured party may have been derelict in bringing the fault to the court's attention.")

I conclude that the Trustee's complaint, insofar as it sets forth a cause of action for fraud on the court, was timely filed. The Trustee has pleaded and may seek relief for fraud on the court. I also note, however, that fraud on the court is the only cause of action I may entertain. The other grounds on which the Trustee could have relied (newly discovered evidence under Rule 60(b)(2) and fraud, misrepresentation, or misconduct under Rule 60(b)(3)) are no longer available to him and may not serve as the basis of relief.

## 2. Failure to Join Necessary Parties

■ Fallon states as his second defense that Neal Satran, Richard Gargiulo, and Edward Gargiulo are necessary parties to this proceeding and that the Trustee's failure to join them requires dismissal of the action. Fallon submitted no argument in support of this defense. Satran and the Gargiulos had notice of this proceeding—all three were witnesses at the trial—but none of them sought to intervene. Fallon did not file a third-party complaint against any of them or otherwise move to join them in this proceeding. The Trustee has not indicated why he chose not to join them.

Neither Satran nor either of the Gargiulos is an indispensable party as that term is defined in Fed.R.Civ.P. 19, made applicable here by Bankruptcy Rule 7019. Their absence in no way prevents me from according complete relief among those already parties. Fed.R.Civ.P. 19(a)(1). Nor does their absence leave Fallon open to a substantial risk of double, multiple, or otherwise inconsistent obligations. Fed.R.Civ.P.

19(a)(2)(ii). Nor does their absence from this proceeding impede their ability to protect whatever interest they may have in its subject matter. Fed.R.Civ.P. 19(a)(2)(i).

If either Fallon or those not joined thought that they would be prejudiced by the failure to join them, the prejudiced party could have filed a motion to intervene or to join the indispensable party. No one moved to join or to intervene. For that reason, and because of Fallon's failure to specify the prejudice to himself or even to argue this issue, I decline to dismiss this proceeding for failure to join.

### The Trustee's Cause of Action

I have ruled that, because this action was commenced more than one year after the entry of the order it seeks to vacate, the Trustee may proceed solely on the theory of fraud on the Court. But the Trustee also claims to state causes of action under 11 U.S.C. section 363(m), which states that an appeals court cannot vacate a sale not stayed pending appeal if the purchaser purchased the property in good faith. This claim and Fallon's contention that the complaint fails to allege that he did not purchase the property in good faith require that I clarify the relation of the purchaser's good faith or lack thereof to the Trustee's cause of action for fraud on the court.

### 1. *Fraud on the Court*

The Federal Rules of Civil Procedure do not define "fraud on the court." Rule 60(b) makes clear, however, that fraud on the court must somehow be distinguished from the fraud, misrepresentation, and other misconduct of an adverse party that is the subject of Fed.R.Civ.P. 60(b)(3). Otherwise, the one year limitation on motions under Rule 60(b)(3) would be rendered meaningless. *Kupferman v. Consolidated Research & Mfg. Corp.* 459 F.2d 1072, 1078 (2d Cir.1972).

■ As it has been applied, fraud on the court refers to a subcategory of fraud, misrepresentation or other misconduct in which the fraud, misrepresentation, or other misconduct is committed by the court, its personnel, or its officers. In *Bulloch v.*

*United States,* 721 F.2d 713 (10th Cir.1983), fraud on the court was defined as

> fraud which is directed to the judicial machinery itself ... fraud where the Court or a member is corrupted or influenced or influence is attempted or where the judge has not performed his judicial function—thus where the impartial functions of the Court have been directly corrupted.

*Id.* at 718. The Second Circuit Court of Appeals adopted a similar definition, one put forward by Professor Moore:

> [T]he concept should "embrace only that species of fraud which does or attempts to defile the Court itself, or is a fraud perpetrated by officers of the Court so that the judicial machinery cannot perform in the usual manner its impartial task of adjudging cases that are presented for adjudication." [Citing 7 Moore, Federal Practice par. 60.33 at 515 (1971 ed.) and *Martina Theatre Corp. v. Schine Chain Theatres, Inc.,* 278 F.2d 798, 801 (2d Cir.1960).]

*Kupferman v. Consolidated Research & Mfg. Corp., supra. See also Wilkins v. Sunbeam Corporation,* 466 F.2d 714, 717 (10th Cir.1972) (the corruption of judicial officers is a clear example of fraud on the court), citing *Root Refining Co. v. Universal Oil Products Co.,* 169 F.2d 514, 534 (3rd Cir.1948); *Matter of Whitney–Forbes, Inc.,* 770 F.2d 692, 698–699 (7th Cir.1985); *Lockwood v. Bowles,* 46 F.R.D. 625, 632 (D.D.C.1969).

■ Where a judgment is obtained by fraud perpetrated by an attorney acting as an officer of the court, the judgment may be attacked for fraud on the court. "Since attorneys are officers of the court, their conduct, if dishonest, would constitute fraud on the court." *H.K. Porter Co. v. Goodyear Tire & Rubber Co.,* 536 F.2d 1115, 1119 (6th Cir.1976), citing *Kupferman, supra,* at 1078, and Restatement, Judgments, sec. 126 comment (c) (Supp. 1948).

> While an attorney 'should represent his client with singular loyalty that loyalty obviously does not require that he act dishonestly or fraudulently; on the contrary, his loyalty to the Court, as an officer thereof, demands integrity and honest dealing with the Court. And when he departs from that standard in the conduct of a case he perpetrates a fraud upon the Court.' 7 Moore, [Federal Practice, Par. 60.33 at 513.

*Kupferman, supra,* at 1078.

■ The case perhaps most often cited on the theory of fraud on the court (and apparently the earliest case in which the term "fraud on the court" was used) is *Hazel–Atlas Glass Co. v. Hartford Empire Co.,* 322 U.S. 238, 247, 64 S.Ct. 997, 1002, 88 L.Ed. 1250 (1944). In *Hazel–Atlas,* Hartford had obtained a patent and a judgment (holding that the patent was valid and infringed) by submitting first to the Patent Office and then to the Circuit Court of Appeals evidence fabricated by Hartford and its attorneys. The case involved fraud perpetrated by attorneys on a court before which they appeared as officers. The Supreme Court, in defining the cause of action and finding Hartford guilty of fraud on the court, focused not only on the fact that the perpetrators of the fraud were officers of the court, but also on the fraud's effect on the integrity of the courts and of the judicial process:

> [T]ampering with the administration of justice in the manner indisputably shown here involves far more than an injury to a single litigant. It is a wrong against the institutions set up to protect and safeguard the public, institutions in which fraud cannot complacently be tolerated consistently with the good order of society.

*Id.* at 246, 64 S.Ct. at 1001. Fraud on the court thus always involves two victims: the individual litigant against whom the judgment was obtained and the court itself, whose integrity is compromised by the fraudulent behavior of its officers. "The very temple of justice [is] defiled." *Universal Oil Products v. Root Refining Co.,* 328 U.S. 575, 580, 66 S.Ct. 1176, 1179, 90 L.Ed. 1447 (1946). Fraud on the court is thus distinguished from the fraud, misrepresentation, and other misconduct that is the subject of F.R.Civ.P. 60(b)(3) in that

fraud on the court is perpetrated, at least in part, by the court or its officers and thus victimizes the court by compromising its integrity.

The list of persons against whom a cause of action for fraud on the court may be brought thus includes attorneys appearing before the court as officers of the court. In a bankruptcy proceeding, that would include counsel for the debtor in possession. Certain non-attorney parties also may be perpetrators of fraud on the court. *Great Coastal Express, Inc. v. International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America*, 675 F.2d 1349, 1357 (4th Cir. 1982). In a bankruptcy proceeding, "the debtor in possession is a fiduciary not only to its creditors but to the bankruptcy court." *Matter of Tudor Associates, Ltd., II*, 64 B.R. 656, 662 (E.D.N.C.1986). The debtor in possession is an officer of the court, *id.*, one who, like a trustee in bankruptcy, bears a special responsibility for the proper functioning of the machinery of justice, a responsibility to act in the best interests of the estate as a whole. Therefore, the debtor in possession is an officer of the court and, as such, can be a perpetrator of fraud on the court.

The complaint in this proceeding alleges that fraud on the court was committed by Neal Satran, counsel for the Debtor in Possession, and by the Debtor in Possession itself. Both Satran and the Debtor were officers of the court who can have committed fraud on the court. Fallon, on the other hand, was not an officer of the court, and thus cannot, by himself, have committed fraud on the court. Still, the judgment in his favor can be vacated for fraud on the court if it can be shown, as the Trustee has alleged, that Fallon colluded with these officers of the court to obtain approval of the sale at the lowest price, and, to that end, colluded with them in perpetrating a fraud on the court. *Hazel–Atlas Glass Co. v. Hartford Empire Co.*, 322 U.S. at 245, 64 S.Ct. at 1001 (Relief granted for fraud on the court has included restraining the beneficiaries of the judgment from taking any benefit whatever

from it.); *Bizzell v. Hemingway*, 548 F.2d 505, 508 (4th Cir.1977) (Defendant who obtained judgment by colluding with plaintiff's attorney was not entitled to benefit from its (the defendant's) fraud.) In other words, a cause of action for fraud on the court can be maintained against one who is not an officer of the court and in whose favor judgment was granted if that person colluded with an officer of the court to perpetrate fraud on the court and thereby obtained the favorable judgment.

This is the cause of action the Trustee has stated. Fraud on the court, as the Trustee correctly uses the term in his complaint, is fraud committed by one who colludes with officers of the court—counsel for and a principal of a debtor in possession—to obtain a judgment in his favor through the corruption of those officers, which corruption prevents them from performing their usual functions in an impartial manner.

### 2. *Absence of Good Faith*

The Trustee must prove not only that Fallon colluded with officers of the court to perpetrate fraud on the court, but also that Fallon did not purchase the property in good faith. The Bankruptcy Court can not vacate a sale conducted pursuant to 11 U.S.C. section 363(b) if that sale was not stayed pending appeal unless the party seeking to vacate the sale proves that the purchaser did not purchase in good faith. This rule, which is reflected in 11 U.S.C. section 363(m), reflects the salutary policy of affording finality to judgments approving sales in bankruptcy by protecting good faith purchasers, the innocent third parties who rely on the finality of bankruptcy judgments in making their offers and bids. *In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir.1986); *In re Sax*, 796 F.2d 994, 998 (7th Cir.1986); *In re Onouli–Kona Land Co.*, 846 F.2d 1170 (9th Cir.1988); *Matter of Chung King, Inc.*, 753 F.2d 547, 549–550 (7th Cir.1985). The finality and reliability of judicial sales enhance the value of assets sold in bankruptcy. *In re Sax, supra*, at 998.

Section 363(m) itself does not apply to this case. It governs the effect that "[t]he reversal or modification *on appeal*" of an authorization under section 363(b) may have on the validity of a sale carried out pursuant to that authorization. 11 U.S. C. section 363(m). Although this matter was remanded to the Bankruptcy Court by the District Court entertaining an appeal from an authorization under section 363(b), the matter before me is not an appeal, but a motion to set aside sale filed pursuant to Rule 60(b) of the Federal Rules of Civil Procedure and Bankruptcy Rule 9024. Therefore, section 363(m) does not apply.

Nonetheless, the policy it implements is as relevant and as applicable to a motion to set aside a sale as it is to an appeal from an order authorizing a sale. In deciding whether to grant the equitable relief the Trustee seeks, the Court recognizes that the finality of bankruptcy sales serves an important policy of the Bankruptcy Code. Therefore, even if section 363(m) does not itself apply to the Trustee's cause of action, the policy and the rule it states must be respected. The Court cannot and will not vacate the sale to Fallon, which was not stayed, unless the Trustee alleges and proves that Fallon was not a purchaser in good faith.

The Bankruptcy Code does not define the term "good faith purchaser," but in the First Circuit as elsewhere, the term has been defined in accordance with its traditional use in equity: one who purchases assets (1) for value, (2) in good faith, and (3) without knowledge of adverse claims. *Greylock Glen Corporation v. Community Savings Bank*, 656 F.2d 1, 4 (1st Cir. 1981) (hereinafter "Greylock") (construing "good faith purchaser" as the term was used in Rule 805 of the former Rules of Bankruptcy Procedure, the predecessor of 11 U.S.C. section 363(m)); *In re Abbotts Dairies of Pennsylvania, supra* at 147; *Willemain v. Kivitz*, 764 2d 1019, 1023 (4th Cir.1985).

In this case, I need only focus on the second element: the requirement that the purchaser have acted in good faith. No adverse claims have been raised here. And although the parties litigated the issue of whether Fallon paid value for the property, I need not address that issue. If Fallon colluded in perpetrating fraud on the court, then he can not have acted in good faith in purchasing the property. And if he did not collude in perpetrating fraud on the court, then by operation of Fed.R.Civ.P. 60(b), the Trustee has no cause of action against him, this action having been filed more than one year after entry of the order authorizing the sale. So I need not reach the issue of value.

The requirement that the purchaser act in good faith was elaborated upon in *In re Rock Industries Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir.1975):

> The requirement that a purchaser act in good faith ... speaks to the integrity of his conduct in the course of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*See also In re Abbotts Dairies of Pennsylvania, Inc.*, 788 F.2d 143, 147 (3rd Cir. 1986); *Willemain v. Kivitz*, 764 F.2d 1019, 1023 (4th Cir.1985); *In re Bel Air Associates, Ltd.*, 706 F.2d 301, 305 n. 11 (10th Cir.1983). This list of acts that would vitiate a purchaser's good faith, though incomplete, clearly includes the act the Trustee complains of: Fallon's alleged collusion with the Debtor in Possession (through one of its principals and its attorney) to obtain court approval of the sale at the lowest possible price. Such collusion, if proven, would constitute not only fraud on the court, but a breach of good faith as well, and would permit the Court to vacate the sale.

The Trustee also claims to state a cause of action under 11 U.S.C. section 363(n), which permits a court to vacate a sale for collusion "among bidders." However, the complaint alleges collusion between the sole bidder and the Debtor in Possession, not among bidders, so section 363(n) does not apply to this case.

In summary, the Trustee has alleged and must prove that Fallon colluded with the Debtor in Possession in commiting fraud on the court and that Fallon acted in bad faith in purchasing the property.

## FINDINGS OF FACT

■ I find that the Trustee has proven his case against Fallon by clear and convincing evidence. Richard Gargiulo as the Debtor's principal and Neal Satran as counsel for the Debtor perpetrated fraud on the court, and Fallon colluded with them in the fraud. The fraud on the court consisted of Gargiulo's and Satran's arranging to sell the property through insider dealing for the lowest price the bankruptcy court would approve instead of through arm's length dealing for the highest price the estate could obtain. It further consisted of a successful effort by Gargiulo, Satran, Fallon and perhaps Nina Parker to conceal Fallon's relationship to the Debtor from the Court and other interested parties, an effort that included outright misrepresentations by Satran and Parker to the Court. The fraud resulted in my authorizing a sale that, had the truth about Fallon's relation to and dealings with the Debtor come to light, I would not have permitted to go forward. Consequently, the Debtor sold the property to Fallon at a price substantially lower than it would have obtained had Satran and Gargiulo not protected Fallon's low offer.

My specific findings are as follows. Fallon learned about the availability of the Debtor's property, not through word of mouth in the local cranberry industry (as Debtor's counsel represented to me)—Fallon at the time had nothing to do with the cranberry industry—but from his friend, Edward Gargiulo, Richard Gargiulo's brother and law partner. The testimony at trial showed that Fallon and Edward Gargiulo met as teenagers and have been close friends for more than twenty years. They communicated frequently with each other. Edward would sometimes give Fallon friendly advice on business matters. In fact, Edward testified that after he brought the Debtor's property to Fallon's attention, Fallon asked his advice about purchasing the property and even tried to interest Edward in purchasing the property with him. Moreover, around the time of the hearings on the objections to the Debtor's Notice of Intended Sale, Edward hired Fallon, who is an electrical contractor, to install new wiring in his house and to do the electrical work for his firm's newly acquired office condominium. In both cases, the business relations were handled informally, as between friends, and certainly not at arm's length, as between business people.

Richard Gargiulo was not as close to Fallon as was Edward—Fallon knew Richard mostly through Edward—but he was friendly with Richard and had known him for many years. In fact, the year before the incidents at issue here, Richard asked Fallon to serve, and Fallon did serve, on the crew that raced Richard's boat from Massachusetts to Bermuda. Fallon lived in close proximity to Richard during the five days of the race and met with him on several other occasions to practice and prepare for the race. So Richard and Fallon were more than passing acquaintances of each other. Fallon's personal relationship to Edward and Richard Gargiulo was never disclosed to the Court or to any party interested in the Notice of Intended Private Sale. Rather, efforts were made to keep that relationship concealed, efforts that included outright misrepresentations by Debtor's counsel to the Court. These arose as follows.

When the Debtor filed its Notice of Intended Private Sale, the Debtor's minority stockholders, Serpa and Florindo, who were at odds with the majority stockholders, objected to the sale as follows:

"1.  The real estate in question has been appraised for an amount considerably higher than the proposed private sale.

2.  There has been no disclosure of the proposed buyer other than the name John Fallon.

3.  Your Petitioners respectfully request that the Court determine the full identity of the proposed buyer and his relationship, if any, to the other parties to

this bankruptcy." Serpa and Florindo's Objection to Notice of Intended Private Sale.

Serpa and Florindo did not appear at the September 10, 1986, hearing on their objection; nonetheless, the Court inquired into Fallon's identity and relation to the Debtor.

The following colloquy transpired between the Court and Nina Parker, who was handling the hearing for the Debtor:

THE COURT: Before you start, counsel, I had a couple of questions.

Had you—had the—Debtor advertised this property for sale publicly?

MS. PARKER: No, your Honor, they did not. They did it simply through private sale mechanism.

THE COURT: And Mr. Fallon is the purchaser?

MS. PARKER: Yes, he is.

THE COURT: And who is Mr. Fallon?

MS. PARKER: Mr. John Fallon is right there (indicating). He is a gentleman of substantial net worth. We have filed a financial statement which indicates net worth in excess of one million dollars. He has been in real estate and other ventures in which he was a self-employed man for over fifteen years. And while he does not have cranberry bog management experience, he has substantial real estate management experience and has obtained, in anticipation of this sale, substantial help with respect to managing and information of cranberry bogs. And he feels prepared to go forward and manage and run the cranberry bogs.

THE COURT: Is Mr. Fallon related to any of the stockholders or principals in the case?

MS. PARKER: No, he is not.

Fallon, Satran, and Richard Gargiulo were all present at the hearing, but none of them added anything to Parker's last response. They left the Court with counsel's misrepresentation that Fallon had no relation to the Debtor's principals. On the basis of this representation and because no one appeared for Serpa and Florindo at the hearing, I overruled their objection.

I also overruled the United States Trustee's objection, but the United States Trustee filed a motion for reconsideration, which I heard on October 2, 1986. Parker, Satran and Richard Gargiulo were present at the hearing; Fallon was represented by counsel, but did not attend himself. Again, the Court raised the issue of Fallon's relationship to the Debtor's stockholders:

THE COURT: Just before we hear Mr. Westgate, I had a couple of questions. I think part of the concern that was raised at the hearing on the intended sale had to do with who Mr. Fallon is and what relationship, if any, he had to the debtor or to any of the debtor's stockholders. And I believe that you testified that he had no relationship—you stated for the record that he had no relationships; is that correct?

MS. PARKER: He was here at the last hearing—

THE COURT: Yes.

MS. PARKER: —and he is not here today. He is represented by counsel, as he was unable to be here. But that is true. There is no relationship. And that's been investigated, because I have met with him on numerous occasions. His title insurance people, his real estate people, the financing—everything—

THE COURT: How did Mr. Fallon learn that the property was for sale?

MS. PARKER: I believe that it was almost general knowledge within the cranberry industry. It's well known that Tri-Cran has been in bankruptcy; that they needed an infusion of cash; and that it was on the market, and we were approached by him.

THE COURT: Did he call you, personally?

MR. SATRAN: He called me.

MS. PARKER: He called Mr. Satran, and, of course, I ended up ultimately dealing with him at numerous things. But he initially contacted Mr. Satran and set up a meeting at our office.

Thus Parker and Satran reaffirmed what Parker had stated at the previous hearing —that Fallon had no relationship to the Debtor's stockholders—and added that the

matter had been investigated. They further represented that Fallon had learned about the property through the grapevine (if I may use that metaphor) in the cranberry industry: "it was almost general knowledge within the cranberry industry." Moreover, they represented that Fallon made the first move by calling Satran. On the basis of these representations and for other reasons stated in my memorandum (entitled Order Approving Sale) of October 8, 1986, this Court overruled the United States Trustee's objection and approved the sale.

Counsel's representations—that Fallon had no relationship to the Debtor's stockholders, that he learned about the property through the cranberry industry, and that Fallon made the first move by contacting Satran—were entirely false. Fallon had a close relationship to the Debtor through the Gargiulos and learned about the availability of the property from Edward Gargiulo, not through the cranberry industry. Moreover, Fallon did not initiate contact with the Debtor by calling Satran. Rather, Edward Gargiulo, an "insider" of the Debtor (see 11 U.S.C. section 101(30)(B)(vi)), made the initial contact and brought Fallon to the Debtor. Fallon then viewed the property with both Richard and Edward Gargiulo before calling and meeting with Satran.

Satran was present during both colloquys and heard Parker's answers to these questions. He knew her answers were false, but breached his duty as an officer of the court and as counsel for the Debtor in Possession by failing to correct them. Satran testified that he thought Parker's answers were true; in his estimation, Fallon had no relation to the Debtor worth mentioning; and, although he knew that Fallon had learned about this property through Edward Gargiulo, it was true that, as between Fallon and Satran, Fallon had made the first move. That is, after Edward and Richard Gargiulo had spoken to Fallon, Fallon called Satran.

I disbelieve Satran's testimony. Satran had experience in bankruptcy law and knew well that Fallon's relationship to the Debtor—his relationship to Edward Gargiulo, Edward's having introduced him to the Debtor, and the subsequent nature of the dealings between the parties (which I will discuss below)—would spark serious concern about the propriety of the intended sale. Moreover, Satran knew he was misleading the Court by stating that Fallon had called him. That statement must be looked at in context. It was made as part of the answer to my question, "How did Mr. Fallon learn that the property was for sale?" Satran and Parker answered that Fallon had learned about the property, not from the Debtor, but through the cranberry industry, and that Fallon had then made the initial contact with the Debtor by contacting Satran. Satran knew that Fallon had learned about the property through Edward Gargiulo, so the answer that Fallon had learned about the property through the cranberry industry was completely unfounded. Parker fabricated it, or at least Satran failed to correct it, solely to mislead the Court and other interested parties.

Satran's misrepresentations concealed not only Fallon's relationship to Edward and Richard Gargiulo; they also concealed from inquiry the improprieties to which the relationship gave rise. The Debtor did not conduct its dealings with Fallon at arm's length or with the intention of getting the best price possible from this sale for the bankruptcy estate. Instead, Satran and Richard Gargiulo arranged to sell the property to Fallon for the lowest price the bankruptcy court would approve, $480,000, which was seventy-five (75%) of the value at which the property had then been appraised, $630,000.00.

On April 14, 1986, Fallon met with Satran and Richard Gargiulo in Satran's office to discuss the possibility of Fallon's purchasing the property. (Fallon was not represented by counsel at the meeting.) Fallon asked Satran, "How cheap can I buy it? What's the minimum price I can buy the property for?" or words to that effect. Satran responded that a Bankruptcy Court usually would not confirm a private sale for less than seventy-five percent of the property's appraised value.

Fallon has argued that Satran's response was intended and understood only as a statement of law, not as an offer. I find otherwise for two reasons. First, Fallon's question did not specifically ask for legal advice about Bankruptcy law; his question asked for the lowest price at which the Debtor would sell the property. More importantly, Satran himself testified that he was offering the property to Fallon for the lowest price a Bankruptcy Court could sanction. Satran explained:

I said that a Bankruptcy Court would not confirm a private sale generally for less than seventy-five percent of appraisal. At that point in time, we had no offers on the table; all of the various investors or other parties had disappeared, as it were; and the company was at its wit's end with regard to the viability of the Chapter 11. And Mr. Fallon came forward. He was interested in buying the property. His purchase price would have realized 100 percent dividend and a $100,-000.00 plus equity [sic] for the stockholders. And as a starting point, if it was at all possible to secure an offer on this property, it was in the best interest of this company to do so.

So Satran intended his answer to Fallon's question as an offer to sell the property for seventy-five percent of appraised value.

Mr. Satran's recitation of the law was correct: in order for a purchaser of assets in a bankruptcy-related sale to be deemed a good faith purchaser, he or she must pay "value" for the property; and a buyer is generally deemed to have paid value when he or she has paid at least seventy-five percent of the asset's appraised value, at least when the appraisal is not contested. *Greylock, supra,* at 4. At the time of the April 14 meeting, the Debtor's property had been appraised for $630,000.00, seventy-five percent of which is $472,500.00. Accordingly, the amount of $480,000 was discussed as a sale price at the April 14th meeting.

Satran confirmed the $480,000 offering price in a letter to Fallon dated May 28, 1986. Neither Satran nor Richard Gargiulo ever asked Fallon for more than that amount for the property. They simply offered it to him for the lowest selling price a Bankruptcy Court could approve. Fallon responded with a letter dated June 25, 1986, offering to purchase all the Debtor's assets for $480,000. Satran then filed the Notice of Intended Private Sale that gave rise to these hearings.

A low offering price can be understood where the Debtor's back is to the wall. A debtor might in such circumstances legitimately offer a low selling price as a means of getting the bidding started. But neither Satran nor Gargiulo used Fallon's low offer to attract competitive bids. The evidence shows they never offered the property to any other bidder at a price in the $500,000 range. They never advertised the property, despite ample opportunity to do so after offering the property to Fallon. And they never even contacted other potential bidders who had shown interest when the offering price was much higher.

They protected and favored Fallon's bid in other ways as well. They did not require that he sign a purchase and sale agreement. They required no deposit from Fallon, but in the Notice of Intended Private Sale, they required that counterofferors submit $50,000 deposits. And as I found above, Satran mislead the Court about Fallon's relationship to the Debtor and effectively prevented the Court and interested parties from discovering and inquiring into a sale to an insider.

The evidence of the negotiations confirms that Fallon received insider treatment, not arm's length bargaining. Fallon claims to have been represented by counsel, but I find no evidence that counsel advised him or negotiated for him in any significant respect. Fallon often "negotiated" directly with Satran. He had his offer typed at Richard Gargiulo's law office. He consulted often about the deal with his friend Edward Gargiulo, an attorney and an insider of the Debtor. See 11 U.S.C. section 101(30)(B)(vi) (defining insider for purposes of Bankruptcy Code). Moreover, Satran communicated frequently during this case with Edward Gargiulo, whose role in this case was that of liaison with Fallon.

In fact, Satran contacted Edward Gargiulo, not Fallon's attorney, to see whether Fallon intended to make an offer. Edward Gargiulo was clearly involved in the negotiations. There is no evidence of arm's length bargaining here, only evidence of non-adversarial, insider dealing.

Had the facts about Fallon's relationship to the Debtor and about the nature of the dealings between them come to light, the Court would not have permitted the sale to go forward. It is clear now that the Debtor was selling the property at a price substantially lower than it would have obtained had the Debtor bargained with Fallon at arm's length and not protected his offer. A debtor who does not ask for at least the fair market value of its property will not get it. And a debtor that does not seek counter-offers will not receive counter-offers. Satran and Gargiulo did neither.

Had they properly exposed the property to the market, they would likely have been able to sell the property for at least $630,000.00, a figure I find to have been substantially lower than the property's fair market value at the time of the hearing on the objections to the Notice of Intended Private Sale. Fallon argues that the Debtor would not have received full fair market value because, at the time of the sale, the Debtor was under a compulsion to sell. At the time of the hearings on the Notice of Intended Private Sale, I ruled that the $480,000 selling price was reasonable largely because the Debtor represented that it was under a compulsion to sell: its secured creditors were seeking relief from the automatic stay to foreclose on the property; it had been able to secure only one offer (Fallon's) on the property; and it had to sell the farm before the winter in order to capitalize on the value of the bogs and the cranberry crop. Now I find that the compulsion to sell was of the Debtor's own making. Satran and Richard Gargiulo got only one offer, not because no one was interested, but because they didn't seek other offers. In September and October, 1986, they had no more time to seek better offers because they had squandered five months not looking for better offers. Ob-

viously, a debtor that deliberately squanders opportunities to market the property in order to protect a low, insider bid from competition can not then claim that the insider deal was fair because, having squandered its time, the debtor was under a compulsion to sell.

In short, had I known of Fallon's relation to the Gargiulos and of the dealings to which that relation gave rise, I would have disallowed the sale because Satran, Richard Gargiulo and Fallon intentionally set the sale price as low as they could and deliberately and effectively insulated Fallon's bid from competitive bidding that would have brought the sale price to fair market value. The sale should not have been allowed to go forward. But, it was allowed to go forward because Satran, Richard Gargiulo, and Fallon, in filing and going forward on the Notice of Intended Private Sale, implicitly represented to the Court that, to the best of their knowledge, the sale had been negotiated and arranged lawfully and in good faith; because neither Satran nor Richard Gargiulo nor Fallon responded forthrightly to the Court's questions and to the objection of Serpa and Florindo to the Notice of Intended Private Sale; and because Satran and possibly Nina Parker deliberately misled the Court through their answers to its inquiries.

The sale damaged the estate in an amount equal to the difference between the sale price, $480,000, and the property's fair market value at the time of the hearings on the sale. The damages also include the attorney's fees and expenses incurred by the Trustee in investigating and litigating this matter.

## CONCLUSION

The Trustee must establish fraud on the court by clear and convincing evidence. *Di Vito v. Fidelity and Deposit Company of Maryland*, 361 F.2d 936, 939 (7th Cir.1966); *Bulloch v. United States*, 721 F.2d 713, 719 (10th Cir.1983); *Matter of Whitney–Forbes, Inc.*, 770 F.2d 692, 699 (7th Cir. 1985). I find by clear and convincing evidence that Fallon colluded with the Debt-

**624**

or's principal, Richard Gargiulo, and with Debtor's counsel, Neal Satran and Nina Parker, in perpetrating fraud on the court. I find also by clear and convincing evidence that Fallon acted in bad faith in purchasing the property. Fallon colluded in perpetrating fraud on the Court and acted in bad faith by participating in the sale as an insider of the Debtor and by failing to disclose that fact to the Court and to parties interested in the Notice of Intended Private Sale. Because of Fallon's undisclosed relationship to Edward and Richard Gargiulo, Richard Gargiulo and Neal Satran favored Fallon by offering the property to him at the lowest price the Bankruptcy Court could approve and by deliberately protecting his bid from competitive bidding. Fallon benefitted from the favorable treatment by obtaining the property for at least $150,000 less than the Debtor could have obtained for it had the Debtor not favored and protected his bid.

Fallon, Satran and Richard Gargiulo all concealed Fallon's close relationship to the Debtor from the Court and from the interested parties, especially Messrs. Serpa and Florindo. The concealment took two forms: nondisclosure and misrepresentation. All three men had a duty to disclose Fallon's relationship to the Debtor, but none came forward. Satran compounded the wrong by affirmatively misrepresenting to the Court the nature of Fallon's relationship to and dealings with the Debtor.

Through their insider dealing, concealment, and misrepresentation, Fallon, Satran, and Richard Gargiulo short circuited the judicial machinery and prevented it from performing its usual function in an impartial manner. They did so in two ways. First, the Debtor and Debtor's counsel breached their fiduciary obligations as officers of the Debtor's bankruptcy estate and of the Court to seek for the estate the best price for the property. In essence, they gave away, and Fallon took, at least $150,000 of the estate's equity. Second, the Debtor and Debtor's counsel breached their fiduciary obligations to the Court and to the bankruptcy estate by concealing and misrepresenting a crucial fact into which

both the Court and the objectors had inquired: Fallon's relationship to the Debtor. They thereby prevented Fallon's relationship to the Debtor from receiving the attention it should have received at the hearings on the objections to the Notice of Intended Private Sale.

In both cases, the corruption of judicial officers prevented the judicial machinery from performing its usual functions—selling property of the estate and adjudicating the propriety of that sale—in an impartial manner. This is fraud on the court. Fallon colluded in perpetrating it and he profited from it. Therefore, I order that the sale be vacated and that Fallon pay the attorney's fees, costs and expenses incurred by the Trustee in investigating and litigating this matter.

SO ORDERED.