**In re WINSTON INN & RESTAURANT CORP., Debtor.**

**WINSTON INN & RESTAURANT CORP., Plaintiff,**

v.

**Agosto DeMICHIEL, Alfons O. Krautz, and Donald H. Capobianco, Defendants.**

Bankruptcy No. 182–10141–353.

Adv. No. 884–0314.

United States Bankruptcy Court, E.D. New York.

Sept. 8, 1989.

Neal M. Rosenbloom and Kevin J. Nash, Finkel, Goldstein & Berzow, New York City, for debtor.

Louis P. Rosenberg, Rosenberg, Rosenberg & Koral, Brooklyn, N.Y., for Donald Capobianco.

Nathan M. Ferst, New York City, for Agosto DeMichiel.

John M. Murray, Steckler, Gutman, Morrisey & Murray, New York City, for Alfons O. Krautz.

## MEMORANDUM DECISION AND ORDER

JEROME FELLER, Bankruptcy Judge.

We dispose here of an unusual claim which culminates an unusually drawn out and unsuccessful Chapter 11 case. This adversary proceeding is essentially a contract action commenced by Debtor against proposed purchasers of the Debtor's restaurant business, for damages incurred as a result of the Defendants' failure to use their best efforts to satisfy a condition precedent to the sale, the acquisition of a liquor license. Based upon our thorough review of the pleadings, memoranda, trial transcripts and exhibits, and post-trial submissions that make up the voluminous record of this adversary proceeding, we are unable to detect a cause of action upon which relief may be granted. As such, for the reasons detailed below, we dismiss the Debtor's complaint pursuant to Fed.R. Civ.P. 12(b)(6), made applicable herein by Bankruptcy Rule 7012(b).

The relevant facts of this litigation are relatively simple and, for the most part, undisputed. Prior to its Chapter 11 filing in January 1982, the Debtor, Winston Inn and Restaurant Corporation ("Debtor" or "Winston Inn"), leased and operated a restaurant at 37 Shore Road, Port Washington, New York, called "The Winston Inn". While it was still an operating entity, Winston Inn borrowed $185,000 at 15½ percent interest from Nassau Trust Company and as collateral granted Nassau Trust a first mortgage in its leasehold and security interests in its accounts receivable and physi-

cal assets. Winston Inn ceased operating its business in May 1981, eight months prior to the filing of its Chapter 11 petition, and in December 1981 it defaulted on its loan payments to Nassau Trust. The bank sought to foreclose and had already begun to advertise a foreclosure sale when Winston Inn filed its Chapter 11 petition on January 22, 1982. The purpose for the Debtor's filing a reorganization petition as an non-operating entity was, according to the Debtor's principal, to "hold off the creditors" so it could find a buyer for its restaurant business. [Tr. p. 22].

Its foreclosure action stayed by the filing, Nassau Trust commenced an adversary proceeding in the bankruptcy court seeking to vacate the automatic stay and to collect the sum of $195,340.95, which it claimed it was owed as of the date of the complaint, June 21, 1982. [Debtor's Exh. # 2, p. 3]. The Debtor interposed an answer to the complaint asserting that it still had equity in the property, in spite of the bank's lien. On consent of the bank, the adversary proceeding was adjourned to allow the Debtor to find a purchaser for the restaurant, and with the proceeds of the anticipated sale to satisfy the bank's claim and to fund a liquidating plan [*Id.*]

The Debtor solicited purchasers and received a written offer from one Francis Gallagher of $250,000 to be paid in the following manner: a $5,000 deposit to be held in an escrow account by Debtor's counsel "subject to [the] signing [of a] contract acceptable to both the buyer, the seller, and the Bankruptcy Court"; a $20,000 deposit "on signing contract", subject to the buyer receiving liquor license approval by the state liquor authority; $125,000 cash at closing and $100,000 over three years at ten percent interest [Debtor's Exh. # 2]. With the written Gallagher offer and a five thousand dollar deposit in hand, the Debtor made application to the Bankruptcy Court for a hearing to approve the sale free and clear of all liens and encumbrances, subject to any higher or better offers to be made at the hearing. The Bankruptcy Court, (Judge Manuel J. Price), signed the order on August 16, 1982 scheduling the hearing for September 16, 1982.

At the hearing before Judge Conrad B. Duberstein acting for Judge Price, Debtor's counsel sketched the terms of the sale before the bidding commenced. Higher and better offers of two varieties were considered: (a) offers with the same terms and conditions as the Gallagher offer but with a higher cash payment at closing and (b) all cash bids. The Court observed that should the sale not "go through on the fault of the offeror, then he loses his deposit", [Debtor's # 6, p. 73], and would be responsible for the cost of readvertising and renoticing the sale. [*Id.*, p. 72]. The Court also recognized that the purchasers were to make prompt and diligent application for the liquor license (hereinafter, the "best efforts" requirement). [*Id.* p. 14]. It was announced that both the highest offer and the next highest offer would be held open for two weeks in order to allow the Debtor's landlord and Nassau Trust to perform the necessary credit checks in order to determine whether to consent to the assignment of the lease to the proposed purchasers. The highest bid at the hearing was made by Donald Capobianco, allegedly on behalf of Alfons O. Krautz and Agosto DeMichiel, the two other defendants in the instant adversary proceeding. The bid was $330,000; $230,000 in cash at the closing, $100,000 over three years with interest at ten percent and subject to the same terms and conditions as the Gallagher offer. (*Id.*, pp. 73, 80). Capobianco tendered his personal check for $5,000 at the close of the hearing.

On October 11, 1982, the Court "so ordered" a stipulation between the landlord and the Debtor "authorizing and empowering" the Debtor to assume its lease and to thereafter assign it to the purchasers. However, this order was conditioned upon the consummation of the sale to the proposed purchasers. [Debtor's Exh. # 4]. An order entitled "Order Approving Sale of Assets" was signed on October 27, 1982 and, in pertinent part, provided:

ORDERED, that the debtor be and hereby is *authorized and empowered to accept the offer* of Mr. Agosto DeMechel [sic] and Mr. Alfons Krautz, to purchase

the debtor's right, title and interest in and to its fixtures, equipment, inventory, furniture and machinery, free and clear of liens and to obtain an assignment of the debtors lease ... in consideration for the sum of $330,000 ... and upon such other terms and conditions as were set forth within the record compiled at the hearing on September 16, 1982; and it is further

. . .

ORDERED, that the debtor be and hereby is *authorized and empowered to execute any and all documents necessary to effectuate the sale* ...; and it is further

"ORDERED, that the sale to Mr. Agosto DeMechel [sic] and Alfons O. Krautz is conditioned upon the said purchasers obtaining the liquor license from the State Liquor Authority." Debtor's Exh. #5, (Emphasis Added).

Despite the authorization given to the Debtor to "effectuate the sale", the Debtor never entered into a written contract with the Defendants. There is evidence, however, that the parties were negotiating just such a contract. Sometime after the entry of the October 27th order, Debtor's counsel drafted an eight page proposed "Agreement" to be signed by the parties sometime in January 1983. [Capobianco Exh. A]. The agreement stated that the Debtor, as seller, agrees to sell and DeMichiel and Krautz, as buyers, agree to buy the seller's restaurant business "in accordance with an order of the United States Bankruptcy Court for the Eastern District of New York dated October 27, 1982." It then outlines the payment plan for the purchase price of $330,000, recognizing the $5,000 deposit already made, and requiring $20,000 "upon the signing of this contract"; $205,000 on closing; and $100,000 in the form of a promissory note, the payment details of which are spelled out in the agreement. The agreement anticipated the purchasers applying for liquor license approval no later than three days from the signing of the agreement and required that the purchasers comply with all requirements of the state liquor authorities. The proposed agreement also provided that in the event

that the state liquor authorities do not act "upon the Buyer's application within sixty (60) days from the date hereof, Seller may cancel its agreement and any monies paid by the Buyer shall be returned and thereupon neither of the parties shall have any further claim as against the other". [*Id.*, p. 5]. It contemplated a closing to take place within forty-eight hours after the Buyer receives notification of approval from the state liquor authorities. (*Id.*, p. 7). That this contract was still being negotiated is evidenced by a letter dated January 27, 1983 from Capobianco to Debtor's counsel [Capobianco Exh. A], requesting further information regarding, for example, the value and identification of the physical assets that the Debtor was actually selling (¶ 5), requesting extensions of certain time periods (¶¶ 1, 4, 6, 7), questioning the effect of certain equipment liens on the overall purchase price (¶ 9), requiring that some leaks on the premises be repaired (¶ 10) and informing Debtor's counsel that the three Defendants had formed a corporation to operate the restaurant called Restaurant Le Cygne, Ltd. in which the triumvirate were equal one third shareholders.

In March, 1983, the Defendants made application to the Alcohol Control Board of Nassau County ("ACB") for a liquor license to be used in connection with the operation of the Winston Inn. After the application was filed, the ACB requested a meeting with the three applicants to gather necessary financial information. Defendant Krautz asserts that some time after the filing of the application and allegedly before the scheduled April 6, 1983 meeting with the ACB, Krautz had informed the two other Defendants that he wished to withdraw from the purchase of the Winston Inn. Krautz reported to Capobianco and DeMichiel that an investigation by an organized crime force into a construction project that he had worked on required his testimony before a grand jury. Krautz, therefore, did not appear at the April 6 meeting nor at any subsequent meetings. There is some question as to whether DeMichiel and Capobianco agreed to seek out

another co-purchaser or were to go through with the purchase alone. Whatever the plan, the parties never furnished the requested financial information to the ACB and after several reminder notices, the ACB, on May 23, 1983, issued a memorandum recommending disapproval because of the defendants' failure to submit the financial information necessary to accurately process the application. The bulk of the testimony adduced at the trial of the adversary proceeding reveals conflicting accounts by the defendants as to the party most blameworthy for the license application fiasco. As we explain below, resolution of this adversary proceeding, happily, does not turn on a determination of that issue.

The Debtor took action on May 31, 1983, when it made application for an order directing the closing of the sale to take place on June 15, 1983. The Court entered the order on June 2, 1983 and notice was sent on June 3, 1983 to Capobianco, as attorney for the purchasers. [Debtor's Exh. 8 and 9]. The Defendants never appeared at the scheduled closing and on September 12, 1983, the court entered an order rescheduling a hearing to consider offers to purchase, to the credit of the Defendants, the Debtor's lease and physical assets. This time, at the hearing on the sale on October 13, 1983, the Debtor had the highest bidder execute a document entitled "Terms and Conditions of Sale." [Debtor's Exh. # 11]. This time the sale was not conditioned upon the purchaser's obtaining a liquor license. In fact, the purchaser was given the option of a $10,000 reduction in the purchase price if he chose to take the restaurant without liquor license approval. [Id.]. By order dated October 26, 1983, the court authorized the Debtor to accept an offer of $235,000, the highest bid at the hearing. [Id.]. The closing of the resale took place on February 9, 1984.

On November 19, 1984, the Debtor commenced this adversary proceeding seeking to recoup the $95,000 drop in the sale price and "not less than $50,000" in expenses incurred as a result of the Debtor's continued possession of the lease from September 16, 1982, the date of the hearing on the sale, through February 9, 1984, the date of the closing on the resale. In its post-trial submissions the Debtor reduced its request for reimbursement of expenses to $39,-964.88 to cover the period from June 15, 1983, the date of the proposed closing, to February 9, 1984. The Defendants each filed answers to the Debtor's complaint as well as cross-claims against one another: Capobianco and DeMichiel against Krautz, and Krautz against Capobianco and DeMichiel. In his answer, Defendant Krautz also asserts as an affirmative defense that the complaint should be dismissed for failure to state a cause of action upon which relief may be granted.

A trial of this adversary proceeding was held on July 30, 1987, October 8, 1987 and October 15, 1987 before Judge C. Albert Parente, who reserved decision. Upon Judge Parente's retirement in 1988, this case was reassigned to the undersigned, the fourth judge to preside over this case. This Court directed and the parties each submitted post-trial proposed findings of fact and conclusions of law and replies. A preliminary motion by Defendant Capobianco to supplement the trial record was denied on April 13, 1989.

DISCUSSION

The Debtor's complaint purports to set forth two causes of action. In reality, however, it merely sets forth two different types of damages asserted to have been incurred as a result of the same alleged wrong: Defendants' failure to use their "best efforts" to obtain a liquor license. The complaint seems to ground this obligation of the Defendants on the record of the September 16, 1982 hearing to authorize the sale. In its post-trial submissions, the Debtor asserts another basis. This one points to the October 27, 1982 order authorizing the sale as the source of the defendants' "best efforts" obligation. Significantly, in the cover sheet to this adversary proceeding, the Debtor styles its claim with the novel label "Action for breach of agreement made in Court and for money damages in connection therewith." None of these stabs at causes of action meets the

mark. As we explain below, the Debtor has failed to specify a basis on which we can find the hoped for sale binding upon the Defendants.

### I.

■ The Debtor's selection of the terms "breach" and "agreement" to label its lawsuit would tend to suggest a contract action. Indeed, the Debtor's theory in this litigation is that the Defendants failed to use their "best efforts" to satisfy a "condition precedent" to the sale—the acquisition of the liquor license. Before we explain the fundamental infirmity in asserting a breach of contract here, we first address ourselves to the "best efforts" contentions made by the Debtor, and attempt to parse this confused and confusing theory since it underlies the Debtor's claimed causes of action.

The Debtor's "best efforts" predicate for the lawsuit can best be understood as a contract action incognito. It is, as a matter of fact, an anticipatory repudiation of a possible defense to a contract action. If the Debtor sued the Defendants on an outright breach of contract claim, the Defendants might be expected to argue the failure of a condition precedent: i.e., they never obtained a liquor license so their obligation under the "contract" to purchase the restaurant never ripened. The repudiation of this defense comprises the Debtor's "best efforts" argument: i.e., the Defendants cannot excuse their non-performance by the failure of a condition precedent if they themselves brought about the failure. The flaw in the Debtor's "best efforts" theory is that even if it is found that the Defendants failed to use "best efforts", that failure, in itself, caused no injury to the Debtor. The Debtor had little or no interest in the success or failure of the defendants' application for a liquor license. Indeed, under the terms of the resale, the purchaser was entitled to a $10,000 reduction in the purchase price if he was willing to acquire the assets without a license. (Debtor's Exh. 11). The Debtor's injuries were caused, if at all, by the Defendants' decision not to purchase the restaurant. It is that alleged wrong, rather than the failure to use "best efforts" which is properly the subject of a contract action.

■ We do not speculate as to whether this obfuscation of a contract action was intentional. But, we do observe that it was convenient, because of a simple fact ignored at the trial of this action: the Debtor never entered into a written contract with the Defendants. Not only did the parties not enter into a written contract, but there is evidence that they did not intend to be bound until the execution of such a document. Under New York law, if parties do not intend to be bound by an agreement until it is in writing and signed, then there is no contract until that event occurs. *R.G. Group, Inc. v. Horn and Hardart Co.*, 751 F.2d 69, 74 (2d Cir.1984). Indeed, sometime after the October 27th order authorizing the Debtor to execute the necessary documents to effectuate the sale, Debtor's counsel drafted a proposed agreement which it sent to Capobianco to review as counsel for the purchasers. The proposed agreement sets forth the material terms of a contract. Crucially, the proposed agreement did not contemplate any further money to be paid by the purchasers until the signing of the contract, at which point the purchasers would pay an additional $20,000 in cash. The $5,000 deposit paid at the hearing remained in escrow. *See, Winston v. Mediafare Entertainment Corp.*, 777 F.2d 78, 81 (2d Cir.1985) (Attorney's promise to hold a check in escrow until his client has signed document suggests an intent that the agreement must be reduced to a signed writing to be binding).

The terms of this proposed agreement mirror the payment plan proposed in the Gallagher offer which was annexed to the Debtor's application for a hearing to approve the sale, and was the very basis for all bids at that hearing. That offer too provided for the deposit to be held in escrow pending the signing of a contract "acceptable to both buyer and seller" and required a $20,000 payment only upon the signing of a contract.

That the parties were still negotiating even the material terms of this agreement

is evidenced by a letter from Capobianco to Debtor's counsel requesting such information as the value of the physical assets the Debtor was selling, questioning the effect of certain equipment liens on the overall purchase price, demanding extensions of certain time periods and informing the Debtor that the actual purchaser would be a corporation named Restaurant Le Cygne, Ltd., instead of Krautz and DeMichiel.

What we are left with, then, is an assertion that the Defendants are liable for the Debtor's alleged damages, but without any coherent theory of causation of those damages. The "best efforts" argument is, if anything, a disguised breach of contract claim, disguised, perhaps, because there is no contract on which to claim breach.

## II.

In search of a source for the Defendants' alleged obligation, the Debtor turns to the September 16th hearing on the sale and the October 27th order authorizing the sale. The Debtor urges that the record of the hearing and the order created an obligation on the Defendants to use their best efforts to obtain a liquor license. Apart from the inadequacies detailed above in the "best efforts" argument as a basis for asserting injury, the reliance upon both the hearing and the court order as creating a binding obligation is misplaced.

The plain language of the order belies any contractual obligation on the part of the Defendants. The order merely "authorize(s) and empower(s)" the Debtor to accept the offer of the Defendants and requires of the Debtor itself the actual task of "effectuat(ing) the sale," executing the necessary documents, and creating that "binding obligation" the Debtor so vigorously seeks to enforce.

Debtor relies upon *Rosecrest Enterprises, Inc. v. Highland Inc. (In re Rosecrest Enterprises, Inc.)*, 80 B.R. 354 (Bankr.W. D.Pa.1987) to support its contention that the court order, which incorporated by reference the conditions of sale stated at the hearing, created a binding obligation on the Defendants. The *Rosecrest* case is inapposite here for several reasons. Most basical-

ly, the case is factually distinguishable from the instant case. Unlike the order in this case which "authorized and empowered," the court order in *Rosecrest* "required [the defendant] to pay the Debtor $12,000.00 ... and to assume the indebtedness owed by Debtor". *In re Rosecrest Enterprises, Inc., supra*, 80 B.R. at 355. Moreover, unlike this case, in *Rosecrest* the parties had entered into a contract. *Id.* Finally, *Rosecrest* is inapplicable because its holding rests upon a view of the bankruptcy court's role which, as we explain below, has become anachronistic with the enactment of the Bankruptcy Code of 1978. *Rosecrest*, a case governed by the Bankruptcy Code of 1978, improperly cites as support for this outdated view a case decided under the former Bankruptcy Act. *Id.* at p. 356, citing *A.H.R.S. Coal Corporation*, 8 B.R. 455 (Bankr.W.D.Pa.1981).

## III.

Under the former Bankruptcy Act, the bankruptcy court itself was conceived to be the seller when property of the bankruptcy estate was sold. *Gekas v. Pipin (In re Met–L–Wood Corp.)*, 861 F.2d 1012, 1016 (7th Cir.1988). The power to sell the bankrupt's property was vested under the former Bankruptcy Act in the bankruptcy court such that "[a]fter a sale ha[d] been confirmed the court and the successful bidder [were] regarded as occupying the relation of vendor and purchaser in an executed sale...." 4B *Collier on Bankruptcy*, ¶ 70.97[1] at 1130 (14th ed. 1978), quoting *Matter of Burr Manufacturing and Supply Co.*, 32 Am.B.R. 708, 217 Fed. 16 (2d Cir.1914). As the actual vendor of the property, the Court held the power to direct the sale in all its practical details. Section 70(f) of the former Bankruptcy Act, codified as former 11 U.S.C. § 110(f) (repealed 1978) and former Bankruptcy Rule 606(b) required property of the estate, unless the court ordered otherwise, to be sold subject to the approval of the court. The requirement of court approval of the sale under the former Bankruptcy Act was hardly surprising. It was said that a bankruptcy sale was a judicial sale in a literal

sense—"one by the court itself with the trustee or other officer who conducts it acting merely as the court's agent." 6 *Remington on Bankruptcy* § 2566 at 60 (Lawyers Co-operative Publishing Company 1952).

The Bankruptcy Code of 1978 eliminates the concept of "court as vendor" by providing in Section 363(b)(1), 11 U.S.C. § 363(b)(1), that "the trustee, after notice and a hearing, may ... sell ... other than in the ordinary course of business, property of the estate." This provision and its implementing procedural rule, Bankruptcy Rule 6004, reflect a marked departure from former Bankruptcy Act concepts and procedures governing the sale of property of an estate in bankruptcy. In the absence of objections to a proposed sale, so long as there is compliance with the notice and a hearing mandate by the trustee or debtor-in-possession, judicial involvement is not required and approval by the bankruptcy judge of the sale is unnecessary. Bankruptcy Rule 6004(e), Advisory Committee Note (1983) (Unlike former Bankruptcy Rule 606(b) under "§ 363(b) court approval is not required unless timely objection is made to the proposed sale."); *Gekas v. Pipin (In re Met–L–Wood Corporation)*, *supra*, 861 F.2d at 1016 ("Under section 363, the trustee or debtor-in-possession is the seller and the bankruptcy court gets involved only through the requirement of notice and a hearing."); *In re Karpe*, 84 B.R. 926, 930 (Bankr.M.D.Pa.1988); *In re Wall Tube and Metal Products Co.*, 56 B.R. 918, 924 (Bankr.E.D.Tenn.1986); *In re Northern Star Industries*, 38 B.R. 1019, 1021 (E.D.N.Y.1984); *In re Robert Hallamore Corp.*, 40 B.R. 181 (Bankr.D.Mass. 1984); *In re Hanline*, 8 B.R. 449 (Bankr.N. D.Ohio, 1981); 2 *Collier on Bankruptcy*, ¶ 363.03 (15th ed. 1989).

One of the major policy decisions embodied in the Bankruptcy Code of 1978 was to effectuate a separation of judicial and administration functions performed by bankruptcy judges under the former Bankruptcy Act. To the extent practicable, the bankruptcy court was removed from administrative activities in bankruptcy cases, with the concomitant expectation that such court would primarily, if not solely, become arbiters or adjudicators of disputes that arise in bankruptcy cases. H.R.Rep. No. 595, 95th Cong., 1st Sess. 107–109 (1977); S.Rep. No. 989, 95th Cong., 2d Sess. 27–28 (1978), U.S.Code Cong. & Admin.News 1978, p. 5787. Central to this separation of administrative and judicial function of bankruptcy judges are the new concepts and procedures governing bankruptcy sales embodied in § 363(b) and Bankruptcy Rule 6004, pointedly reflecting the reality that the bankruptcy court is no longer the seller. Accordingly, we find meritless the Debtor's contention that the record of the September 16, 1982 hearing and the October 27, 1982 order of the bankruptcy judge alone, absent a written contract between the parties, created binding agreements between the Debtor and Defendants. The many cases by the Debtor in support of its contentions regarding the significance of the hearing and order are inapplicable. With the exception of the *Rosecrest Enterprises, Inc.* case, *supra*, they were decided under the former Bankruptcy Act and have no bearing in light of the sweeping changes made by the Bankruptcy Code of 1978 in respect of bankruptcy sales.

### IV.

Construing the complaint in the light most favorable to the Debtor/Plaintiff and taking its allegations to be true, *Hishon v. King & Spalding*, 467 U.S. 69, 73, 104 S.Ct. 2229, 2232, 81 L.Ed.2d 59 (1984); *Holmes v. New York City Housing Authority*, 398 F.2d 262, 265 (2d Cir.1968), we find that the Debtor failed to state a cause of action upon which relief may be granted and accordingly the complaint must be dismissed. We therefore do not reach the issues raised in the Defendants' cross-claims.

### ORDER

It is hereby ORDERED, ADJUDGED AND DECREED that the complaint filed by the Debtor in Adversary Proceeding No. 884-0314 be dismissed pursuant to Fed.R. Civ.P. 12(b)(6), made applicable herein by

Bankruptcy Rule 7012(b), without costs to any party.