**In re WINSTON INN & RESTAURANT CORP., Debtor.**

**WINSTON INN & RESTAURANT CORP., Plaintiff,**

**v.**

**Agosto DeMICHIEL, Alfons O. Krautz, and Donald H. Capobianco, Defendants.**

**No. CV 89-3756 (RR).**

United States District Court, E.D. New York.

Oct. 31, 1990.

Finkel Goldstein Berzow & Rosenbloom, New York City by Neal M. Rosenbloom, Kevin J. Nash, for debtor.

Rosenberg Rosenberg & Koral, Brooklyn, N.Y. by Louis P. Rosenberg, for defendant Capobianco.

Nathan M. Ferst, New York City, for defendant DeMichiel.

Steckler, Gutman, Morrisey & Murray, New York City by John M. Murray, for defendant Krautz.

MEMORANDUM and ORDER

RAGGI, District Judge:

Debtor Winston Inn & Restaurant Corporation appeals the dismissal of its action against defendants Agosto DeMichiel, Al-

fons O. Krautz and Donald H. Capobianco for failure to satisfy the conditions precedent to a sale to them of certain bankruptcy assets. *See* Bankruptcy Rule 8001 and 28 U.S.C. § 158 (1988). The bankruptcy court correctly characterized this as an action for breach of contract. This court disagrees, however, with its finding that defendants, successful bidders at a judicial proceeding to dispose of debtor's assets, were not bound to consummate the sale authorized by the court. Accordingly, the judgment of dismissal is reversed and the case remanded.

## FACTUAL BACKGROUND

The factual background of this case is set forth at some length in Judge Jerome Feller's published opinion, familiarity with which is assumed. *In re Winston Inn & Restaurant Corp.*, 104 B.R. 589 (Bankr.E. D.N.Y.1989). As Judge Feller observed, the facts are, for the most part, undisputed. Nevertheless, it is useful to set out here the most relevant events.

Debtor operated a restaurant in Port Washington, New York. The lease and restaurant chattels were subject to a first lien and security interest held by Nassau Trust Company. Finding itself unable to maintain payments due to Nassau Trust, debtor filed a Chapter 11 petition on January 22, 1982, and proceeded to seek a purchaser for the restaurant business.

The first written offer for $250,000 was received from Francis Gallagher. By its terms, it provided for payment of a $5,000 deposit to be held in escrow subject to the signing of a contract acceptable to the buyer, seller and bankruptcy court. An additional $20,000 deposit was to be made on signing such a contract subject to the buyer receiving approval for a liquor license. Thereafter, $125,000 would be paid at closing, with $100,000 payable over three years at ten percent interest.

Pursuant to 11 U.S.C. § 363(b) (1988), the debtor gave notice of the offer and a hearing was scheduled by Judge Manuel J. Price for September 16, 1982 to determine whether sale should be permitted free and clear of any secured interests in the property, as provided for in 11 U.S.C. § 363(f) (1988). The hearing was conducted on that date by Judge Conrad B. Duberstein, acting for Judge Price. Judge Duberstein called for competing bids on the same general terms and conditions set forth in the Gallagher offer, announcing that if the highest bidder should, by his own fault, fail to go through with the sale, he would lose his deposit and would be responsible for the cost of readvertising and noticing the sale.

The highest bid—for $330,000—was made by Donald Capobianco, purportedly on behalf of defendants Krautz and DeMichiel.[1] Capobianco provided a personal check to satisfy the $5,000 deposit requirement. A total of $230,000 was subsequently to be paid in cash, with $100,000 payable over three years at ten percent interest. The bid was "accepted by the Court subject to the terms and conditions laid out in the beginning of these proceedings." The court also held open the second highest bid until it could be determined that the restaurant lessor would agree to the necessary lease assignment to defendants.[2]

After assignment approval was obtained, Judge Duberstein, on October 27, 1982, entered an "Order Approving Sale of Assets," which "authorized and empowered" the debtor to accept the defendants' offer "upon such terms and conditions as were set forth within the record compiled at the hearing on September 16, 1982." The order further authorized and empowered the debtor "to execute any and all documents necessary to effectuate the sale" and conditioned the sale upon the defendants' receipt of a liquor license. The court expressly retained jurisdiction "in the event that there is a default by the purchaser on

---

1. Debtor claims that Capobianco was a secret partner with his co-defendants in bidding on the restaurant business, a contention disputed by Capobianco. The relative liability of the defendants is to be considered on remand.

2. The second highest bid was for $325,000: $225,000 payable in cash, with $100,000 payable over three years.

payment of any remuneration called for by this sale."

Thereafter, debtor's counsel drafted a proposed contract, setting forth the terms of payment as agreed to at the hearing. This draft recognized the $5,000 deposit made at the hearing, and required the payment of another $20,000 "upon the signing of this contract," with $205,000 due at closing and the execution of a $100,000 promissory note. The draft also required defendants to apply for liquor license approval within three days of signing the contract. Debtor retained the right to cancel the agreement and return any deposit if the liquor license was not granted within sixty days of application.

In January 1983, Capobianco wrote to debtor's counsel seeking clarification of various issues relating to the items being sold as part of the business and the effect of certain equipment liens on the overall purchase price. He further requested various extensions of time and that certain repairs be made. There is no record of a response. In any event, the proposed contract was never signed.

Nevertheless, sometime in March 1983, Capobianco did file an application for a liquor license in connection with the acquisition of debtor's restaurant business, attaching thereto a copy of the bankruptcy court's order authorizing the sale. The Alcohol Control Board of Nassau County thereafter requested a personal interview of all three defendants. Upon their failure adequately to comply—apparently because defendant Krautz was then the subject of a criminal investigation—the Board denied them a license on June 23, 1983.

On May 31, 1983, having become impatient at defendants' apparent inaction, debtor obtained an order from the bankruptcy court directing the closing to take place on June 15, 1983. Judge Price expressly ordered "Mr. Agosto DeMechel [sic] and Mr. Alfons Krautz ... to immediately take steps to close the sale of the debtor's assets in accordance with an order of this Court, dated October 27, 1982 and the record compiled at a hearing held before this Court on September 16, 1982." When defendants failed to comply with this order, the bankruptcy court, on September 12, 1983, scheduled a hearing to consider new offers to purchase. At that hearing, held October 13, 1983, debtor's restaurant business was sold to a new buyer for $235,000. The debtor and the new buyer executed a written sales agreement the same day, which was subsequently authorized and approved by court order dated October 26, 1983.

Debtor commenced this proceeding on November 19, 1984, against Capobianco, DeMichiel and Krautz, seeking to recover the $95,000 deficiency between their bid and the ultimate sale price, as well as "not less than $50,000" in consequential damages caused by the delay. The complaint states that defendants "failed to comply with the terms of sale" and "breached their offer to purchase the restaurant" by failing to use their best efforts to obtain a liquor license.

After numerous delays and adjournments, a three-day trial was conducted on July 30, 1987, October 8, 1987 and October 15, 1987 before Judge C. Albert Parente, who reserved decision. Upon Judge Parente's retirement in 1988, the case was reassigned to Judge Feller who, on September 8, 1989, issued the decision and order that is the subject of this appeal.

Reasoning that debtor's claim was essentially one for "breach of contract," Judge Feller found that there was, in point of fact, no contract to breach in light of "evidence that [the parties] did not intend to be bound until the execution" of a written contract. *In re Winston Inn & Restaurant Corp.*, 104 B.R. at 593–94. While this conclusion appears to rest upon a finding of fact, the court held, in the concluding paragraph of its decision, that dismissal was not mandated by the debtor's failure to *prove* its claim, but by its failure to *state* a claim. *Id.* at 595.

Rejecting debtor's argument that the bankruptcy court's order of sale was the functional equivalent of a written contract, Judge Feller held that that order merely authorized the debtor to accept the defendants' offer and "require[d] of the Debtor

itself the actual task of 'effectuat[ing] the sale,' executing the necessary documents, and creating that 'binding obligation' the Debtor so vigorously seeks to enforce." *Id.* at 594. Judge Feller expressly rejected the concept of the "court as vendor," holding that, although this concept had formerly supplied the jurisdictional basis for judicial sales under the Bankruptcy Act, it no longer pertained to a sale held under 11 U.S.C. § 363. *Id.* at 594–95.

## DISCUSSION

Debtor argues that the bankruptcy court erred as a matter of law in holding that Judge Duberstein's order authorizing the sale to defendants did not, in and of itself, constitute a binding and enforceable obligation. Certainly, prior to the 1978 enactment of the Bankruptcy Code, and specifically 11 U.S.C. § 363, the law was clear that a successful bidder at a bankruptcy judicial sale was bound by his bid. *See, e.g., In re Crown Corp.*, 679 F.2d 774, 777 n. 4 (9th Cir.1982) (successful bidder at judicial sale bound by his bid until court either approves or disapproves it); *Frazier v. Ash*, 234 F.2d 320 (5th Cir.), *cert. denied*, 352 U.S. 893, 77 S.Ct. 133, 1 L.Ed.2d 87 (1956) (high bidder at bankruptcy sale generally bound until there is confirmation that makes bilateral agreement or refusal of court to confirm has nullified bid); *In re Childs*, 163 F.2d 379 (2d Cir.1947) (bankruptcy court has summary jurisdiction to give redress against delinquent purchaser at bankruptcy sale).[3] Thus, a delinquent purchaser could be held liable for any deficiency resulting from resale. *See* 4B *Collier on Bankruptcy* ¶ 70.98, at 1202–03 (14th ed. 1978).

As noted, however, Judge Feller held that this principle no longer applies under the Bankruptcy Code. Although, under the Bankruptcy Act, the bankruptcy court was considered the vendor of estate property when sold at a judicial sale, *see id.* at 1173, under § 363(b) of the Code, the trustee or debtor in possession is treated as the seller.[4] Accordingly, Judge Feller concluded that no binding agreement exists between debtor and bidder until they themselves enter into a written contract.

■ Judge Feller is correct that, in the vast majority of sales under § 363(b), the bankruptcy court is primarily involved to provide notice and hearing. *See Matter of Met–L–Wood Corp.*, 861 F.2d 1012, 1016 (7th Cir.), *cert. denied*, —— U.S. ——, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1988). Indeed, under § 363(f), even sales of encumbered property are made technically by the trustee or debtor in possession rather than by the court, so long as the lienholder "consents" or the "price at which such property is to be sold is greater than the aggregate value of all liens on such property." 11 U.S.C. § 363(f)(2) & (3). As this case demonstrates, however, the bankruptcy court, consistent with its summary powers in the bankruptcy context, still plays an all-important supervisory role in § 363 sales. *See, e.g., Matter of Mann*, 45 B.R. 755, 757–58 (Bankr.S.D.Ohio 1985) (bankruptcy court's power over defaulting purchaser derives from fact that "judicial sale is the nexus of the action").

It was, after all, before the bankruptcy court that the lienholders in this case appeared on the date of the hearing to ensure that their interests were adequately safeguarded at any sale of the debtor's restaurant business. Indeed, the record of proceedings before Judge Duberstein plainly demonstrates that the court felt obligated to ensure that no bids for the business were accepted except on terms satisfactory to the lienholders. The court then supervised the bidding and ultimately "accept[ed]" defendants' offer subject to the terms and conditions announced at the be-

---

3. This view is consistent with the principles that govern judicial sales in other areas. As one authority states, "[a]fter the bid is accepted in other areas, the bidder is subject to the power of the court to exact compliance with his bid upon confirmation of the sale, and after the property is struck off, the bidder has no power, at his pleasure, to retract his bid and thus baffle and defeat the sale." 47 Am.Jur.2d *Judicial Sales* § 383, at 597 (1969).

4. 11 U.S.C. § 1107 (1988) provides that a debtor in possession has virtually all the rights, powers and duties of a bankruptcy trustee.

ginning of the hearing. Thereafter, it was the court that "authorized" the debtor to take whatever steps were necessary to effect the sale on the terms bid, and it was the court that ordered the purchaser to proceed to closing.

Thus, the bankruptcy court, even if not technically the seller, continues to play an active and important role under the Code as referee in the judicial sale of encumbered assets. The public policy concerns that necessitate this judicial involvement mandate a finding that parties who bid successfully before the court under the Code continue to be bound by their offers to the same extent that they would were bound under the Bankruptcy Act. Quite simply, under the Code, as under the Act, " '[p]ublic policy requires stability' " in bankruptcy sales. *In re Karpe*, 84 B.R. 926, 932 (Bankr.M.D.Pa.1988) (quoting *In re Stanley Engineering Corp.*, 164 F.2d 316, 318 (3rd Cir.), *cert. denied*, 332 U.S. 847, 68 S.Ct. 351, 92 L.Ed. 417 (1948)). " 'To induce bidding at such sales and reliance upon them, the purpose of the law is that they shall be final.' " *Id.*

Bidders have an obvious interest in knowing that an accepted bid will not lightly be set aside. *Id.* The Code expressly recognizes this interest in § 363(m), which protects *bona fide* purchasers from having authorized transactions voided. *See In re Stadium Management Corp.*, 895 F.2d 845, 847 (1st Cir.1990); *Matter of Met–L–Wood Corp.*, 861 F.2d at 1019.[5]

The debtor and lienholders, of course, also have an interest in finality: the debtor, because it is committing itself to a particular bid, while other bids, perhaps only slightly less favorable, are rejected; the lienholders, because they are entitled to know the terms under which property in which they hold an interest is to be sold, free of the uncertainty that the debtor and bidder will later reach some different private agreement that fails to safeguard their interests.

It is for this reason that, even after enactment of the Code, courts have continued to refer to proceedings such as these as "judicial sales." *E.g., In re Stadium Management Corp.*, 895 F.2d at 847 (quoting *In re Tri–Cran, Inc.*, 98 B.R. 609, 617 (Bankr.D.Mass.1989); *In re Bel Air Assocs., Ltd.*, 706 F.2d 301, 305 n. 11 (10th Cir.1983); *In re Karpe*, 84 B.R. at 932. Indeed, the policy concerns that underlie judicial sales are common to both the Act and the Code, a fact that has prompted one authoritative commentator to conclude that "[t]he Code makes no material change to the cases decided under the Act with respect to sales [made] free of liens...." 2 *Collier on Bankruptcy*, ¶ 363.07, at 363–30 (15th ed. 1979).

Thus, a number of courts, faced with this situation, have considered a successful bidder at a § 363 judicial sale bound by a bankruptcy court's order authorizing or confirming the sale. *See In re Rosecrest Enterprises, Inc.*, 80 B.R. 354, 356 (Bankr. W.D.Pa.1987) (bankruptcy court's decree of sale is controlling upon parties and purchaser is bound by language of that decree); *Matter of Mann*, 45 B.R. at 758 (sale lawfully ordered, duly conducted and confirmed by court orders is binding on defaulting purchaser); *In re Governor's Island*, 45 B.R. 247, 256 (Bankr.E.D.N.C. 1984) (delinquent purchaser held liable to extent of agreed-upon liquidated damages).

The bankruptcy court in this case distinguished *Rosecrest*—which it said reflected an "anachronistic" view of the role of the court—on the grounds that the parties in that case had in fact entered into a purchase agreement, and that the court's order expressly required the bidder to pay a sum certain to the debtor, rather than simply authorizing and empowering the debtor to sell the property. *In re Winston Inn & Restaurant Corp.*, 104 B.R. at 594.

This court finds these distinctions unpersuasive. First, the parties' own agreement

---

**5.** 11 U.S.C. § 363(m) provides:

The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under

such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

played no role in the *Rosecrest* decision. *In re Rosecrest Enterprises, Inc.*, 80 B.R. at 355–56. Indeed, that agreement was never even signed. *Id.* at 355.[6] Second, the fact that Judge Duberstein's order "authorized" the debtor to sell the restaurant to defendants, but did not expressly order defendants to pay money, is a distinction more of form than of substance, since he expressly retained jurisdiction in the "event that there is a default by the purchaser on payment ... called for by this sale." Indeed, when defendants failed to close on the property in a timely manner, Judge Price ordered their compliance with the terms bid.

Finally, the suggestion that *Rosecrest* reflects an "anachronistic" view of the law is at odds with the continuing need under the Code, already noted by this court, to ensure the finality of court-supervised sales of encumbered assets following competitive bidding. *See In re Governor's Island*, 45 B.R. at 254 ("The very nature of the bankruptcy process requires that sales of property of the estate be final."). Moreover, despite the passage of 12 years since the enactment of the Code, it appears that no court has yet allowed a successful bidder at a sale authorized by the bankruptcy court to renege on its bid.

■ Thus, this court finds that upon Judge Duberstein's authorization of the sale, defendants were bound to consummate the transaction on the terms stated.

The fact that the parties may thereafter have sought to memorialize the bid terms into a written contract is not a basis for finding that they were free to act as if a binding agreement had not previously been entered into. *See generally Reprosystem, B.V. v. SCM Corp.*, 727 F.2d 257, 261 (2d Cir.) (" 'mere fact that the parties contemplate memorializing their agreement in a formal document does not prevent their informal agreement from taking effect prior to that event' ") (quoting *V'Soske v. Barwick*, 404 F.2d 495, 499 (2d Cir.), *cert. denied*, 394 U.S. 921, 89 S.Ct. 1197, 22 L.Ed.2d 454 (1969)), *cert. denied*, 469 U.S. 828, 105 S.Ct. 110, 83 L.Ed.2d 54 (1984). Although it is generally a question of fact whether parties did or did not intend to be bound prior to execution of a formal written contract, *Reprosystem, B.V. v. SCM Corp.*, 727 F.2d at 261; *Winston v. Mediafair Entertainment Corp.*, 777 F.2d 78, 80 (2d Cir.1986), because the parties' agreement in this case was reached in the context of a judicial sale, it is deemed binding as a matter of law for the policy reasons already stated.[7]

■ Similarly, the court is unpersuaded by defendants' argument that, because the judicial sale left unresolved certain questions about what equipment would be transferred with the restaurant business, no agreement was binding until these matters were settled. The law has long cautioned buyers at judicial sales that they bid

---

**6.** In *Matter of Mann*, the parties signed a purchase agreement the same day as the judicial sale, yet the court made it clear that the liability imposed on the defaulting purchaser was not based on any "separate or distinct contract of sale ... because the confirmation of the sale is equivalent to a valid contract of sale." 45 B.R. at 758.

**7.** Even if this were not the case, this court could not agree with the holding below that the issue of the parties' intent to be bound even before execution of a formal contract must be decided against the plaintiff as a matter of law. The defendants did, after all, take some steps to procure a liquor license for the Winston Inn & Restaurant, attaching to their application the court's order authorizing sale of the debtor's restaurant to them. Viewed in the light most favorable to plaintiff, this suggests that defendants did think they had a firm commitment on

the part of the debtor to sell the restaurant to them if they obtained the license. Moreover, at the trial before Judge Parente, the defendants at times seemed to be conceding the existence of a binding agreement to purchase the debtor's restaurant. Mr. Capobianco, on cross-examination, testified that when co-defendant Krautz announced that he could not go forward with the liquor license application because of his criminal problems, Capobianco "told him that he was leaving us in a terrible position because *we had a contract* where he was involved." Trial Transcript at 264 (emphasis added). Although the parties disputed their legal obligation to debtor in their post-trial submissions to the bankruptcy court, the simple fact is that sufficient evidence was adduced of defendants' intent to be bound by their successful bid before Judge Duberstein to preclude resolution of this factual issue against debtor as a matter of law.

at their own risk as to the fair value of the property offered. *See In re Governor's Island,* 45 B.R. at 254. To allow purchasers to bid hundreds of thousands of dollars before a court, to have lienholders agree to the bid, and then to have the purchasers renege upon further inquiry into the nature of the property, would interject an intolerable element of uncertainty and inequity into judicial sales. *Id.* It would give an advantage to those who blithely bid in ignorance at the expense of those who have made more careful inquiry into the reasonable value of the property offered for sale. Moreover, it could deprive the debtor and lienholders of the benefit of an offer made by a more serious bidder.

This court's determination that defendant-bidders were bound to consummate the sale on the terms authorized by the court does not, of course, resolve the question of the scope of damages owed by defendants for their subsequent default. While that issue is remanded for consideration by the court below, it may nevertheless be helpful here to set out certain relevant facts.

Debtor sues for $95,000, the differential between the price bid by the defendants and the price actually realized at the subsequent sale, plus $50,000 in further alleged consequential damages. As a general rule, "a delinquent purchaser may be ordered to pay the deficiency resulting from a resale." *In re Governor's Island,* 45 B.R. at 256. As the court noted in that case, however, liquidated damage provisions have become more prevalent in bankruptcy proceedings. *Id.* at 257. Although these are generally provided for in contracts entered into between the parties themselves, in this case, Judge Duberstein announced as a condition of the bidding that a successful bidder who failed to go through with the sale would lose his deposit and bear the costs associated with advertising and noticing a resale. *Cf. In re Crown Corp.,* 679 F.2d at 776–77 (unclear whether court was applying liquidated damages clause of original offer to all subsequent bids). Thus, on remand, it will be appropriate for the parties to address, and the court to consider, whether this condition served as the functional equivalent of a liquidated damages provision, thereby limiting the amount that debtor may recover for the default.

### CONCLUSION

The defendants, successful bidders at a judicial sale conducted pursuant to 11 U.S.C. § 363(b), and subsequently authorized by order of the bankruptcy court, were bound to consummate the sale on the terms bid. The case is remanded to the bankruptcy court to resolve outstanding issues as to the liability of the respective defendants and to determine the scope of awardable damages.

SO ORDERED.