In re OYSTER BAY COVE, LTD., Debtor.

Bankruptcy No. 890–83499–478.

United States Bankruptcy Court, E.D. New York.

Dec. 8, 1993.

Jaspan, Ginsberg, Schlesinger, Silverman & Hoffman by Steven R. Schlesinger and Gary Herbst, Garden City, NY, for Trustee Kenneth P. Silverman.

Dollinger, Gonski, Grossman, Permut & Hirschhorn by Matthew Dollinger and Michael J. Spithogiannis, Carle Place, NY, for the Chaim Ankari.

Otterbourg, Steindler, Houston & Rosen, P.C. by Steven B. Soll, New York City, for The Bank of New York.

DOROTHY EISENBERG, Bankruptcy Judge.

This matter comes before the Court upon the application of Kenneth P. Silverman, the Chapter 7 Trustee (the "Trustee") to retain

as liquidated damages a deposit by the highest bidder at a Trustee's auction sale of the Debtor's real property based upon the bidder's failure to consummate the sale.

### FACTS AND BACKGROUND

Oyster Bay Cove, Ltd. ("Debtor") filed a voluntary petition pursuant to Chapter 7 of the Code on November 21, 1990. Kenneth P. Silverman was appointed to serve as trustee ("Trustee").

By Order dated June 6, 1991, the Court approved the Trustee's application to sell by public auction approximately 30 acres of vacant, partially improved, land belonging to the Debtor, free and clear of liens, with liens to attach to the proceeds. Annexed to the Order and incorporated in that order were approved "Terms and Conditions of Sale" which provided, inter alia, that the property would be sold "as is" and subject to such facts as an accurate survey may show, including any covenants, restrictions and easements of record (Exhibit 4, ¶ 5). The "Terms and Conditions of Sale" further provided a liquidated damages provision requiring the successful bidder to forfeit his deposit in the event of his failure to pay the balance of the purchase price within thirty days of the Order approving the sale.

The Trustee served notice of the sale on June 7, 1991 to a number of potentially interested parties and the creditors listed in Debtor's schedules, and advertised the sale in the. July 12, 1991 edition of Newsday. Certain lien creditors were not given actual notice of the sale, but no lien creditor, although subsequently notified, has objected to the sale.

On the day of the auction, August 7, 1991, maps of the property were posted on the wall outside the courtroom and placed on the tables in the courtroom where the auction took place. A Memorandum of Sale was handed to anyone who registered and gave the Trustee a deposit in anticipation of bidding. In addition, the "Terms and Conditions of Sale" from the June 6, 1991 Order was read aloud and copies of same were provided to all bidders in attendance. The Trustee asked all bidders if they had any questions before the bidding commenced and answered any questions. There were approximately forty-two bidders who were given numbers. Several parties bid on the property, even though approximately seventy-five to one hundred parties appeared at the courtroom for the auction.

The auctioneer testified that there were twenty-seven qualified bidders for individual lots and fifteen bidders for the property involved. The property was offered as thirty-one point seven plus or minus (31.7 + or −) acres in bulk, or twelve individual lots. Lot #62, which was a dedicated street, was never offered for sale; and Lot #72, a storm basin, was never offered for sale on an individual basis. The deed prepared by the Trustee to convey the property to the successful bidder, Chaim Ankari ("Ankari") was for the entire property owned by the Debtor, and did include Lots #62 and #72, since this was a bulk bid. The Property had been subdivided and a map of the property and "Declaration of Covenants and Restrictions" was filed with the appropriate local authorities and was recorded on May 3, 1989. This revealed that the subject property contained an offer of dedication of road to the Incorporated Village of Oyster Bay Cove. Prior to the closing, the Incorporated Village of Oyster Bay Cove never exercised or released its rights provided to it pursuant to the terms of the offer of dedication.

Ankari had placed a deposit of $250,000 with the Trustee, which allowed him to bid for the property as a single parcel.

Ankari made the highest bid for the entire property in the sum of $2,600,000 at the auction and signed documents entitled: (1) "Terms and Conditions of Sale", which was essentially identical to the one approved by the June 6, 1991 Order, and (2) "Memorandum of Sale" through which Ankari acknowledged, inter alia, that he had read the "Terms of and Conditions of Sale" and had agreed to be bound by them. By Order dated August 7, 1991 the Court approved the sale of the property to Ankari. That order has never been challenged or appealed by Ankari.

The closing of the sale, which was specified as "time of the essence," was scheduled for 10:00 a.m. on September 6, 1991. However,

neither Ankari nor his attorney appeared at the Trustee's office on the closing date. A day or two prior to the closing date, Ankari's counsel advised the Trustee of claimed "title defects" (*see*, pg. 65, Tr.–1/15/92) and one day prior thereto provided the Trustee with a copy of the title report. While the Trustee did not believe that any title defects existed, the Trustee, in an attempt to resolve alleged issues, was willing to adjourn the closing or to escrow the sale proceeds to the extent of Ankari's claim. The adjournment was conditioned upon Ankari demonstrating his good faith by delivering to the Trustee, by 4:00 p.m. on September 6, 1992, a list of the specific objections to closing, a copy of the "certified check" for the balance of the purchase price evidencing Ankari's ability to close on the Property and the return of the New York State Real Property Transfer Gains Tax Questionnaire. (*See* Trustee's Exhibit "9"). Neither Ankari or his counsel appeared at any time on September 6, 1992 at the Trustee's office. The Trustee proceeded with the closing at 5:08 p.m. by executing a deed and noting the default of Ankari. Prior to this time, no evidence of an ability to pay the balance of the purchase price, or specific objections to closing, had been delivered to the Trustee.

At or about 6:17 p.m. on that date, Ankari's counsel faxed a letter to the Trustee claiming the Trustee was in default because the Trustee could not deliver marketable title. The Trustee subsequently applied for and received authorization and approval from the Court to conduct a second auction sale of the property on similar terms. All lien creditors were actually served and no one objected to the sale or entry of that order. The price obtained was $2,125,000, which was $475,000 lower than Ankari's bid at the original auction and $375,000 lower than the unsuccessful second highest bidder at the original auction. That sale was consummated.

The Trustee now seeks an Order of the Court declaring Ankari in default and declaring the forfeiture of Ankari's deposit. Ankari has vigorously opposed the Trustee's request and has attacked the validity of every potentially assailable aspect of the sale and the closing.

For the reasons that follow, the Court finds each one of Ankari's arguments without merit and holds in favor of the Trustee.

## SUMMARY OF ANKARI'S ARGUMENTS

Ankari opposes the Trustee's application principally on four (4) separate grounds:

(a) The Trustee failed to give advance notice to certain lienors and/or parties in interest as was required under the Bankruptcy Code, the Bankruptcy Rules, and by Court Order for the sale to have been proper and unassailable;

(b) The Trustee was not *able* to close title at the agreed upon time and day set for the *time of the essence closing*, thereby absolving Ankari from any requirement to close title;

(c) The existence of numerous title objections which were not disposed of on or before the time set for closing excused Ankari from performing; and

(d) The Court should infer from the conduct of the Trustee in (i) accepting Ankari's title report for the purpose of considering and disposing of title objections; (ii) agreeing to hold sufficient sums in escrow to cure title defects; (iii) agreeing to an adjournment of the "time of the essence" closing to cure title objections (provided Ankari deposit additional monies on account of the sale); and (iv) notifying interested parties (as identified by Ankari) about the *second auction*, that the Trustee acknowledged his inability to close title at the time set for closing, *to wit:* September 6, 1991 at 10:00 a.m.

For the reasons that follow, the Court finds each one of Ankari's arguments to be without merit and finds in favor of the Trustee.

## DISCUSSION

Bankruptcy Code Section 363(b)(1) authorizes a trustee to sell property of the estate other than in the ordinary course of business after notice and a hearing. 11 U.S.C. § 363(b)(1). Subsection (f) further authorizes the trustee, under certain conditions, to sell such property free and clear of other interests. 11 U.S.C. § 363(f).

Ankari is now challenging the order of the Bankruptcy Court authorizing the sale to him on his original bid. It is well settled that an Order of Sale by the Bankruptcy Court cannot be collaterally attacked. *In the Matter of Garfinkle,* 672 F.2d 1340, 1348 (11th Cir.1982) *(citing, Slocum v. Edwards,* 168 F.2d 627 (2nd Cir.1948), 4(b) *Collier on Bankruptcy* 70.98(18) (14th Ed.1978). *See also, In re Met–L–Wood Corp.,* 861 F.2d 1012 (7th Cir.1988) *cert. denied, Gekas v. Pipin,* 490 U.S. 1006, 109 S.Ct. 1642, 104 L.Ed.2d 157 (1989). This general rule has been applied to preclude purchasers whose bids have been accepted and authorized by the Bankruptcy Court from reneging on their obligations to consummate the purchase as authorized at a judicial sale.

In order to set aside the Court's Order of sale, it would be necessary to seek relief pursuant to an appropriately filed appeal and a request for a stay of the sale, or a motion for relief from the order entered into by the Court pursuant to Rule 60 of the Federal Rules of Civil Procedure as made applicable by Bankruptcy Rule 9024. What we have in this case is a final, non-appealable order of the Bankruptcy Court approving a sale of real property to Ankari for a fixed sum. It cannot now be collaterally attacked as void *ab initio. In the Matter of Garfinkle, supra.*

Furthermore, in order to provide stability and finality to judicial sales, successful bidders at judicial sales of debtor's assets pursuant to section 363 of the Bankruptcy Code are bound and obligated to consummate the sale when it is authorized by the Bankruptcy Court. *In re Winston Inn and Restaurant Corp.,* 104 B.R. 589, *reversed and remanded,* 120 B.R. 631 (Bankr.E.D.N.Y. 1990); *In re Governor's Island,* 45 B.R. 247 (Bankr.E.D.N.Y.1984).

In *In re Winston Inn and Restaurant Corp.,* Judge Raggi stated:

> To allow purchasers to bid hundreds of thousands of dollars before a court, to have lienholders agree to the bid, and then have the purchasers renege upon further inquiry into the nature of property, would interject an intolerable element of uncertainty and inequity into judicial sales. *Id.* It would give an advantage to those who blithely bid in ignorance at the expense of those who have made a more careful inquiry into the reasonable value of the property offered for sale. Moreover, it could deprive the debtor and the lienholders of the benefit of an offer made by a more serious bidder.

*In re Winston Inn & Restaurant Corp.,* 120 B.R. at 637.

Ankari's argument that the sale was defective because certain lienholders did not receive notification is without merit. First, such an argument is not properly brought by a purchaser as a purchaser does not have standing to make such a challenge. *See Singleton v. Wulff,* 428 U.S. 106, 96 S.Ct. 2868, 49 L.Ed.2d 826 (1976). Any potential challenge by a lienholder not properly noticed of the intended transfer of its lien or sale of its collateral would have a claim against the Trustee and/or the Debtor's estate, but not against the purchaser. Such lienholder would not have any rights against the property purchased, or against the purchaser. The final order of the court authorizing the sale free and clear of liens to the purchaser is not affected. Bankruptcy Code Section 363(m) specifically provides that reversal or modification on appeal of an order authorizing a sale does not affect the validity of the sale to an entity that purchased in good faith. 11 U.S.C. § 363(m). Any potential claimants resulting from the Trustee's failure to give notice would have the right to an action against the proceeds held by the Trustee or the Debtor's estate or against the Trustee in certain circumstances, but there would be no action available against an innocent purchaser. The Trustee and the estate are responsible to any lien creditor when the Court directs that property will be sold free and clear of liens with the liens, if any, to attach to the proceeds. The innocent purchaser is fully protected.

Ankari argues that the Order of June 6, 1991, which authorized the Trustee to conduct the public auction sale and scheduled a hearing for the Court to approve that sale, required the Trustee to sell the property free and clear of all interests including an irrevocable offer of dedication, dated January 31,

1989, to the Incorporated Village of Oyster Bay Cove of a road which runs through the property. Ankari argues that he may not be held in default because the Trustee was unable to convey the property "free and clear" from the offer of dedication.

■ The Order which approved the Trustee's application to sell the property free and clear of all liens, claims encumbrances and rights of others of whatever kind or nature (the "Liens"), with such liens to attach to the proceeds of the sale of the property, means that the property was to have been sold free and clear of liens *against the property, i.e.* mortgage liens, judgment liens, etc., which could attach to the proceeds. The language does not indicate that the property is to be sold free and clear of non-monetary restrictions of record which run with the land. The recitation of a dedication of a street or road to the village is a statement of fact as is the recitation of metes and bounds which runs with the land, and describes that which is being offered for sale.

This is clearly evident from and consistent with the "terms and conditions of sale" which explicitly provided, *inter alia,* that the property was being sold "as is" and subject to "any covenants, restrictions and easements of record."

■ Because the June 6, 1991 Order and annexed terms of sale formed the basis of the agreement of the parties, it must be construed according to general principles of contract law. *See United States v. ITT Continental Baking Co.,* 420 U.S. 223, 238, 95 S.Ct. 926, 935, 43 L.Ed.2d 148 (1975). In construing such language "deference is to be paid to the plain meaning of the language ... and normal usage of the terms." *Berger v. Heckler,* 771 F.2d 1556, 1568 (2d Cir.1985). In the Court's view, interpreting the plain meaning of any language requires that the language be considered within the context it was written. Through consideration of the entirety of the Order of June 6, 1991, it is clear that the sale was not to be free of such items as the offer of dedication for a road. Ankari's urged expansive interpretation of the "free and clear" language of the Order is inconsistent with the fifth decretal paragraph which authorized the property to be sold "as

is" and "subject to covenants, easements, and restrictions of record". Therefore, Ankari's interpretation is invalid.

Ankari alternatively argues that the offer of dedication was not encompassed within the disclaiming language of the "Terms and Conditions of Sale" because an offer of dedication is not a "covenant, easement or restriction". Thus, Ankari argues, he was not obliged to take title subject to the offer of dedication. However, as with Ankari's previous arguments, this one fails when placed in the context of the terms of sale as a whole.

■ Without assessing the validity or revocability of the offer of dedication, the Court notes that it may be true that if the Village of Oyster Bay Cove accepts the offer of dedication, the offer could result in a transfer to the Village of a fee simple interest in specific portions of the land. *See, e.g., Fusaro v. D'Angelo,* 41 A.D.2d 567, 340 N.Y.S.2d 233 (2d Dept.1973); and *Water Products Co. v. Gabel,* 120 Ill.App.3d 668, 671, 76 Ill.Dec. 194, 197, 458 N.E.2d 594, 597 (2d Dist.1983). Notwithstanding this possibility, Ankari's argument fails because the "Terms and Conditions of Sale" explicitly provided that the property was to be sold "as is". The doctrine of caveat emptor applies to bankruptcy sales. *In re Laughinghouse,* 51 B.R. 869, 876 (Bankr.E.D.N.C.1985) (*citing Governor's Island v. Eways (In re Governor's Island )* 45 B.R. 247 (Bankr.E.D.N.C.1984).

Even were the Court to believe, which it does not, that the Trustee was at fault for some unintentional misrepresentation regarding the offer of dedication, in light of both the language of the "Terms and Conditions of Sale" specifying that the property was being offered "as is", and the maps prominently displayed just outside the courtroom on the day of the auction clearly showing a road running through the property, the Court finds it incredible that Ankari, before making a $2,600,000 bid, did nothing to confirm whether or not the sale was free and clear of the offer of dedication. "A court of equity will not undertake, any more than a court of law, to relieve a party from the consequences of his own carelessness."

*Slaughter's Administrator v. Gerson,* 80 U.S. 379, 13 Wall. 379, 20 L.Ed. 627 (1872).

 There was no evidence presented that the property did not have marketable title. Under New York law, marketability of title rests on whether there is an objection to title which would interfere with a sale or with the market value of the property. *Regan v. Lanze,* 40 N.Y.2d 475, 387 N.Y.S.2d 79, 83, 354 N.E.2d 818, 822 (1976). Under New York law, marketability of title does not assure the purchaser a title free from every doubt, or even every encroachment. Rather, it shields the purchaser from defects in title that are more than simply possible or very remote. *Id.*

 Under New York law, easements and encroachments, particularly when they are open and notorious, do not automatically render title unmarketable; the purchaser is presumed to purchase land subject to easements and encroachments if they are visible, open and notorious. *Short Clove Assocs. v. Ilana Realty, Inc.,* 154 B.R. 21 (S.D.N.Y. 1993). The dedication of the street was clear on the face of the map and on a review of documents filed in the appropriate town. Under New York law, there is a distinction between marketable title and insurable title. *Short Clove Assocs. v. Ilana Realty, Inc., supra; Hudson–Port Ewen Associates, L.P. v. Chien Kuo,* 165 A.D.2d 301, 566 N.Y.S.2d 774 (3d Dept.1991), *aff'd,* 78 N.Y.2d 944, 573 N.Y.S.2d 637, 578 N.E.2d 435 (1991). No evidence has been introduced to indicate that the trustee could not convey marketable title. This Court finds that title was marketable, and in fact, it was sold by the Trustee pursuant to a subsequent auction sale and order of sale by this Court. Even if there were any serious issues raised by the title company which might effect insurability, the purchaser was obligated to consummate the purchase since the title was marketable. He argues that based upon the fact that the Trustee never executed the appropriate transfer tax documents in compliance with New York State law prior to closing, the Trustee could not hold Ankari in default. However, such a document would have been easily executed at the closing. It appears that the trustee was prepared to do so, but, did not merely be-

cause neither Ankari nor his attorney appeared at the closing. In light of the representation made by Ankari's attorney that the closing would not proceed, to have required the Trustee to tender the New York State Transfer Tax forms would have been a useless act which the law does not require. *See, e.g., Governor's Island v. Eways (In re Governor's Island)* 45 B.R. 247, 256 (Bankr. E.D.N.C.1984), wherein the court held that to tender a deed where the purchaser advised he would not close "would be a useless act which the law does not require." Similarly, Ankari argues that the Trustee was unable to perform at the "time of the essence" closing in that the Trustee did not tender the deed until 5:08 p.m. despite the fact that the closing was scheduled for 10:00 a.m. In light of Ankari's representations regarding the "title problems" just prior to the scheduled closing date, the Court finds the Trustee's delay commendable rather than lamentable. There is no indication that the Trustee did anything at 5:08 p.m. that could not have been done at 10:00 a.m. that morning. It appears that the Trustee wished to give Ankari every opportunity to appear. Thus, it would be simply ludicrous for this Court to reward Ankari and allow him to escape default merely based on an act of courtesy by the Trustee.

Ankari's argument, that the trustee could not hold Ankari in default because the Trustee was unable to timely perform, is without merit.

 It is well settled that in order to place a vendor under a contract of sale in default for a claimed failure to provide clear title, the purchaser normally must first tender performance himself and then demand good title. *Willard v. Mercer,* 83 A.D.2d 656, 442 N.Y.S.2d 200 (3rd Dept.1981), *aff'd* 58 N.Y.2d 840, 460 N.Y.S.2d 18, 446 N.E.2d 774 (1983). See, *Ilemar Corp. v. Krochmal,* 44 N.Y.2d 702, 405 N.Y.S.2d 444, 376 N.E.2d 917 (1978). Further, a vendor must be afforded a reasonable opportunity, even beyond the contract specified last day, to make his title good. *Willard v. Mercer,* 58 N.Y.2d 840 at 841, 460 N.Y.S.2d 18, 446 N.E.2d 774. Ankari never offered full payment or evi-

dence to indicate he was financially able to close.

Ankari failed to consummate the purchase pursuant to the offer made and approved by the Bankruptcy Court.

## CONCLUSION

This Court has jurisdiction of this matter. It is a core proceeding, having arisen out of actions taken before this Court and in violation of an order entered in this case. It is necessary to dispose of the issues before the Court in order to fully administer the assets of this Debtor's Estate.

The sale was proper and unavoidable. The Court's Order of Sale was final and not appealable at this time.

The Trustee was able to close the passing of title on September 6, 1991 at 10:00 a.m., but waited until after 4:00 p.m. to enable Ankari to come to the closing with appropriate evidence of an ability to close. Ankari never provided any evidence of his ability to consummate the sale. The Trustee's preparation of the deed later in the day does not result in any negative inference against the Trustee.

The existence of any title objections raised by the title company, did not excuse Ankari from performance under the order of sale. There was no showing that title to the property was not marketable.

The Court draws no inferences from any of the acts of the Trustee to indicate that he was unable to close pursuant to the time or other conditions or terms of sale. The deed was capable of being recorded and was in recordable form and was tendered on the date fixed for the closing.

The irrevocable offer of dedication was not a lien against the property or the proceeds of sale. The fact that there had been an offer of dedication made to the village was a fact which could be ascertained by any party interested in determining the facts as to the description of the property which was being offered for sale. It was clearly shown on the map of Oyster Cove Development and on other filed documents available to the public for review.

Having found Ankari's arguments to be without merit, and noting that the deficiency between Ankari's bid and the subsequent sale price obtained is substantially in excess of the liquidated damages clause of the "Terms and Conditions of Sale", the Court rules in favor of the Trustee and grants his motion in its entirety. The Trustee is authorized to retain the deposit of Ankari in the amount of $250,000 as liquidated damages.

Settle an Order in accordance with this Decision.